OPINION TO THE GOVERNOR.

APRIL 16, 1952.

PRESENT: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

OPINION TO GOVERNOR in response to inquiry as to whether proposed industrial development corporation constituted public purpose for which public funds might be expended.

April 16, 1952

To His Excellency Dennis J. Roberts
Governor of the State of Rhode Island
and Providence Plantations

We have received from your excellency a request for our written opinion, in accordance with the provisions of section 2 of article XII of amendments to the constitution of this state, upon the following question:

> "When the General Assembly of the State of Rhode Island determines and declares the existence of a grave public emergency menacing the health, safety, morals and welfare of its citizens resulting from recurring depressions and unemployment caused by the lack of diversified industry and stated to be remediable not by private enterprise alone but only by effective state action, does the creation by the General Assembly of the Industrial Development Corporation of Rhode Island for this purpose, with the powers and subject to the limitations set forth in the Act (H-520, Substitute 'A') constitute a public purpose for which public funds may be expended?"

Our examination of a printed copy of H 520 (Substitute "A") discloses that it expressly declares that the proposed industrial development corporation of Rhode Island shall not have the power of eminent domain nor the power to pledge the credit of the state. The bill, however, provides for the appropriation of $1,000,000 of public funds to be used by the state in purchasing all of the stock of such corporation, and it authorizes the corporation, among other things, to use the capital thus derived solely from public funds to acquire "industrial sites and rights incidental and appurtenant thereto"; "to construct industrial plants upon said sites"; and to lease the same to private industry under terms therein specified. As drawn the bill obviously does not authorize the corporation to take private property by condemnation and, therefore, on that ground the present bill would not violate the provisions of article I, section 16, of our state's constitution which forbid the taking of private

property except for a public use. However, inasmuch as the bill contains an appropriation of public funds it still poses the question whether such appropriation is within the constitutional power of the general assembly.

Your excellency's request for our opinion appears to be rather narrowly confined to the question whether the purpose for which public funds àre appropriated in this bill, H 520 (Substitute "A"), is a public use. If we restrict our answer solely to that question a majority of the justices are of the opinion that the purpose for which public funds are thus appropriated is a private and not a public use. In this respect, however, we think it is unnecessary to give extended reasons for that view because, notwithstanding the conclusion on that question, we are unanimously of the opinion that the general assembly is constitutionally vested with the power to enact the bill in its present form. In other words, from the observations in your letter of transmittal and from certain provisions and limitations in the bill, we have taken the liberty to construe your excellency's request more broadly, as though it also asked for our opinion as to whether the bill, H 520 (Substitute "A"), could be constitutionally enacted even assuming that it appropriated public money for a private purpose.

We are clearly of the opinion, even though the appropriation therein is for a private purpose, that the general assembly may validly pass the bill in question by virtue of the power expressly conferred by article IV, section 14, of the constitution of this state. That section provides that "The assent of two-thirds of the members elected to each house of the general assembly shall be required to every bill appropriating the public money or property for local or private purposes."

Pursuant to that section for many years the general assembly annually has appropriated substantial sums of public money for the use of a number of private societies and corporations which are engaged in conducting institutions

or agencies that perform works of a charitable, benevolent, educational or civic nature. The constitutional validity of such grants of public funds for private purposes is unquestionable, provided the record of the vote in each house of the general assembly shows that the members thereof had full knowledge of the private purpose of the appropriation in the bill upon which they were voting, and provided that two thirds of the elected members of each house voted in favor thereof. *In re House of Representatives,* 45 R. I. 289.

In our judgment the appropriation for the purposes set forth and limited in the instant bill, H 520 (Substitute "A"), is as constitutionally valid as the grants to the institutions, societies, or agencies above mentioned. The public benefits that would be derived indirectly from its enactment appear to be as likely as those resulting from the appropriations for such private purposes. Moreover, under such bill there is a measure of public control over the use of the funds appropriated by reason of the ownership of the stock of the corporation by the state itself, a factor which is absent in the outright grants or donations to the private agencies or societies above mentioned.

For these reasons there is as much justification in principle for the appropriation of public money for the purposes set forth and limited in the instant bill as there is in the case of appropriations annually being made for purely private agencies or societies as above set forth. In any event the general assembly is the sole judge of those matters. If two thirds of the elected members of each house of the general assembly deem a bill of this kind to be a wise and prudent use of public funds with reasonably probable, although indirect, beneficial results to the public, the general assembly is empowered by article IV, section 14, of the state's constitution to enact it.

Needless to say this is a broad and great power. However, the framers of the constitution expressly vested such power in that department of government. Their action evidently

flowed from an abiding confidence that no member of the general assembly would knowingly vote to appropriate public funds for a purely private purpose which was totally unrelated to the public welfare and without any reasonable expectation that the public generally would derive therefrom at least some indirect and substantial benefit. Moreover they probably felt that in the circumstances an effective check on any possible abuse of such power was reasonably assured by requiring for its exercise a two-thirds vote of the members elected to each house.

This conclusion seems to be strengthened if we consider that article IV, section 14, of the constitution is not a grant of power but rather a limitation upon the almost absolute power which the general assembly claimed to possess prior to the adoption of the state's constitution. It is familiar history that after the state declared its independence of Great Britain on May 4, 1776, the general assembly assumed the right to exercise all the powers of the king and parliament. From that time until the state government under the new constitution was organized in 1843, the general assembly exercised supreme legislative, executive and judicial powers except as restricted by the federal constitution. *City of Providence* v. *Moulton,* 52 R. I. 236, 242, 243. Of course, under the claim of such broad powers the general assembly at that time by a mere majority vote could grant public funds for the uses it deemed to be appropriate regardless of whether or not they were strictly public uses.

In view of that circumstance and in view of the fact that article IV, section 10, expressly provides that "The general assembly shall continue to exercise the powers they have heretofore exercised, unless prohibited in this constitution," the framers of our constitution apparently deemed it prudent to include section *14* under the same article, thereby forestalling the possibility of public money being appropriated for private purposes by a mere majority of the members of each house voting for such an appropriation.

From the consideration we have been able to give the bill and the question propounded by your excellency, we respectfully submit that H 520 (Substitute "A") as it now stands, if enacted by a duly recorded vote of two thirds of all the members elected to each house of the general assembly, will be a constitutionally valid act. On the other hand, we may suggest that if it is desired to amend the bill by striking out the provision appropriating the public money and by substituting in lieu thereof a provison authorizing the corporation to finance its operations wholly by the issuance of revenue bonds in no way whatsoever to be or become obligatory upon the state, we see no objection to its enactment by the customary majority vote of those voting thereon. See *Opinion to the Governor,* 58 R. I. 486.

<div align="right">

EDMUND W. FLYNN
FRANCIS B. CONDON
JEREMIAH E. O'CONNELL

</div>

We concur in the opinion of the majority of the justices that the act is constitutional when viewed as an appropriation of "the public money or property for local or private purposes," Rhode Island constitution, article IV, section 14, or if the act is amended to provide for the issuance of revenue bonds instead of appropriating public money for the purposes therein specified. But we disagree with the statement in the majority opinion that the appropriation of public money is not for a public use. In our judgment such appropriation is for a public use. Ordinarily we would state our reasons for such view, as we did in the *Opinion to the Governor,* 76 R. I. 249, but in the above-mentioned circumstances we see no need for doing so.

<div align="right">

Antonio A. Capotosto
Hugh B. Baker