R. B. McConnell, Appellant,

*v.*

City of Lebanon, Tennessee, Appellees.

*(Nashville,* December Term, 1957.)

Opinion filed May 2, 1958.

500

WILLARD HAGAN, Lebanon, for appellant.

E. R. WOOLARD and WILLIAM D. BAIRD, Lebanon, for appellee City of Lebanon.

BASS, BERRY & SIMS, Nashville, for Hartmann Luggage Company.

GEORGE F. McCANLESS, Attorney General, ALLISON B. HUMPHREYS, Solicitor General, Nashville, for the State.

Mr. Justice Swepston delivered the opinion of the Court.

The question involved in this appeal is the constitutionality of Ch. 209, of the Public Acts of 1955, known as "The Industrial Building Bond Act of 1955". That is, whether or not said Act and the actions which are sought to be taken thereunder violate Art. II, Section 29 of our State Constitution.

Said Act need not be copied in this opinion in full but is attached hereto as Appendix A (see post, p. 20) and only the substance of such parts of said Act will be stated as deemed advisable.

Art. II, Section 29 of the State Constitution provides in part as follows:

"Sec. 29.  Counties and towns—Power to tax—Credit.—The General Assembly shall have power to authorize the several counties and incorporated towns in this State, to impose taxes for County and Corporation purposes respectively, in such manner as shall be prescribed by law; and all property shall be taxed according to its value, upon the principles established in regard to State taxation.  But the credit of no County, City or Town shall be given or loaned to or in aid of any person, company, association or corporation, except upon an election to be first held by the qualified voters of such county, city or town, and the assent of three-fourths of the votes cast at said election.  Nor shall any county, city or town become a stockholder

with others in any company, association or corporation except upon a like election, and the assent of a like majority. * * *''

Pursuant to this Act, the town of Lebanon has made a contract with Hartmann Luggage Company, a Wisconsin corporation, for the lease for a period of 25 years, with renewal privileges, of a factory building to be constructed by said municipality with the proceeds of the bonds authorized by the Tennessee Industrial & Agricultural Development Commission and the Building Committee which after a full hearing, has made all necessary findings required by the terms of said Act and has authorized the issuance and sale of $350,000 of bonds in accordance with said statute.

All other necessary legal steps have been taken by the City of Lebanon including an election by which much more than three-fourths of the qualified voters, as required by the statute, have voted in favor of the execution of the purposes permitted by said statute by the City of Lebanon.

The complainant, R. B. McConnell, being the elected and qualified Commissioner of Finance & Revenue of said City of Lebanon, by reason of certain published opinions of this Court, entertains a doubt as to his authority to execute and attest the bonds intended to be issued under said proceedings. Hence, he has filed this bill seeking a declaratory judgment as to the validity of same. All of the foregoing facts are averred in the original bill and the fact that said Commissioner of Finance & Revenue of said City deems said proceedings to be unconstitutional. The answer of the City of Lebanon admits all of these averments of the original bill except the allegation of the

unconstitutionality of these Acts, which the answer asserts to be in all respects constitutional. The answer further avers that for the period from 1900 to 1950, according to the Federal Census, the County of Wilson has lost 760 citizens and from 1950 to 1955, said County has lost 147 citizens. That said loss has not been due to lack of birth of children because in the City of Lebanon and Wilson County the school rooms are crowded and overflowing; that 10 and 20 years ago whereas they had 40 to 60 children in one of the grades in elementary school with two classes and two teachers, they now have 250 to 300 children in the same classes in the elementary schools with 8 and 9 teachers.

That there is only one reason for this loss of population, which is a lack of job opportunities for the citizens of Lebanon and Wilson County, which forces their citizens to migrate to other states which are more industrialized and provide employment for them. Further that the State of Tennessee, in 1950, lost one Congressional seat because it did not keep pace with the increased population generally over the preceding ten-year period, and that if the same rate of migration of the people of said City and County continue at the same rate, the State will lose another Congressional seat in the next decade.

Further, that from 1950 to 1956 the State of Tennessee lost 80,000 citizens through migration and that said condition has been the subject of articles appearing in some of the leading newspapers of the State. The result of all of the above, it is averred, is that the cities, counties and the State of Tennessee are suffering a great financial loss by reason of the cost incurred in educating its children, which upon finishing school or college, are forced to emi-

grate to other states where job opportunities and the quantity of pay is more attractive and available. It is further averred that the average family income throughout the United States is $3,400 as compared to the average family income of $2,400 in the City of Nashville.

Further, that the State of Tennessee and its component parts consisting of the counties and towns throughout the State, have in a number of instances lost industries to other states, especially in the south, because this State heretofore has had no financial plan or program effective through the instrumentality of the arms of the State Government, that is, the counties and cities.

The Chancellor heard the cause on bill and answer. He filed a full memorandum opinion in which he held first, that the said statute and the proceedings taken thereunder by the City of Lebanon were for a public purpose. Secondly, that even though for the sole private purpose to aid private industry, yet since the bonds were issued pursuant to the terms of the statute and were ratified by a three-fourths vote in the referendum election, that they would be valid.

Counsel for appellees make the same insistence in their reply brief on appeal. That is, that the bonds are issued for a public purpose, but that, even if they were for the purpose purely private of aiding private industry, they would nevertheless be valid under the second paragraph of said above quoted constitutional provision.

We are not prepared to agree with this insistence by counsel for appellees that, even though these bonds are not issued for a corporate or public purpose, that they would nevertheless be valid because they were approved

by a vote of three-fourths of the qualified voters. Counsel cites *Azbill v. Lexington Mfg. Co.*, 188 Tenn. 477, 221 S.W. 2d 522; *Ferrell v. Doak*, 152 Tenn. 88, 275 S.W. 29, 46 A.L.R. 590; and *Berry v. Shelby County*, 139 Tenn. 532, 201 S.W. 748.

So far as we have been able to find there are only two cases in Tennessee that even intimate that the second paragraph, *supra*, of said constitutional provision authorizes the lending of aid or credit for a private purpose to a private individual or corporation on a mere vote of the qualified number of voters. Both of these cases are in 188 Tenn. The first is *Carter v. Beeler*, 188 Tenn. 328, 335, 219 S.W. 2d 195, 198, in which there is an inadvertent statement referring to the second paragraph, *supra*, of the constitutional provision relating to the lending of credit, and it is clearly erroneous. It is there stated:

"This provision of the Constitution applies to situations where the credit of a county or city is to a private corporation or individual *and for purposes that are not county purposes. Berry v. Shelby County*, 139 Tenn. 532, 201 S.W. 748; *Patterson v. Washington County*, 136 Tenn. 60, 188 S.W. 613." (Emphasis ours.)

The latter part of the above quotation is not supported by either case cited. In the Patterson case (136 Tenn. 60, 188 S.W. 615), the *purpose was public*, that is, the building of county roads and the Court simply held that that did come under the first clause of said constitutional provision and not under the clause we have described herein as the second paragraph. It merely stated:

"The clause last referred to inhibits the lending of credit to a private enterprise except upon an election to be held under its provisions."

That, however, is a far cry from stating that such private enterprise need not be the means of effectuating a corporate purpose. For example, a city subscribing to stock in a gas light corporation, a private enterprise, to be constructed for the principal purpose of supplying gas to the city and its inhabitants, as in the case of *City of Memphis v. Memphis Gayoso Gas Co.* (before 1870) 56 Tenn. 531.

Moreover, in *Berry v. Shelby County,* supra, after referring on page 540 of 139 Tenn., on page 750 of 201 S.W. to said second paragraph, which originated in the Constitution of 1870, Mr. Chief Justice M. M. Neil stated unequivocally on page 541 of 139 Tenn., on page 750 of 201 S.W.:

"Furthermore, such lending of aid or subscription of stock must be for a county or corporation purpose, under the express terms of the constitutional provision quoted: and Mr. Justice Turley, in *Nichol v. (Mayor, etc., of Town of) Nashville,* supra (28 Tenn. 252), suggested that this would be true even without a formal requirement of the Constitution. However, such is the positive requirement."

In further analysis and exposition of said Art. II, Sec. 29, after defining direct and indirect purpose, it is made clear in the *Berry case,* supra, that the requirement that the purpose be corporate pervades the entire provision. On page 543 of 139 Tenn., on page 750 of 201 S.W., it is pointed out that:

If the purpose be direct, and be accomplished by direct action of the county or city, as in building, or employing others to build for it, the county's bridge,

or the city's waterworks, to be owned by the county or the city, the matter falls under the first part of section 29, no election is required.

Immediately following that, it is stated that even if a direct, as well as an indirect, purpose is to be accomplished by a county or city lending its credit to some other and separate entity, or by subscribing to stock therein, then the facts fall within the second provision which requires an election, etc.

Then in the same *Berry case,* supra, 139 Tenn. on page 543, 201 S.W. on page 750, the Court cited *Colburn v. Chattanooga Western Railroad Co.,* 94 Tenn. 43, 28 S.W. 298. In that case, the County of Hamilton had entered into a contract for the railroad company to unite with it in the building of a public county bridge to be used jointly by the railroad and the county. The special act purporting to authorize this contract *did not contain a provision for submitting the matter to a vote of the people.* The Court held, says Mr. Chief Justice M. M. Neil, that for this reason the contract was void; that it constituted a lending of the credit of the county to the railroad company, and, *though for an undoubted county purpose,* which the county by its own individual efforts, a county bridge, might have rendered effectual, yet it could not unite with another in such an enterprise without the sanction of the popular vote under the second paragraph of Section 29, *supra.*

In the Berry case the enabling act and the resolution of the county court sought to accomplish a public purpose, that is, to *donate* a sum of money to Bolton College, a trust for the education of the poor white children of Shelby County, but the act was invalid, because it did

not require an election by the qualified voters of the county.

In the Colburn case on page 53 of 94 Tenn., on page 301 of 28 S.W. last full paragraph, it is said:

"It is evident that the letter and spirit of this provision is that the county shall not be a stockholder not joint owner with any company, association, or corporation in any enterprise or improvement, *although it may be one in which the county may be otherwise authorized to enter.*"

Again, in *Johnson City v. Charleston, C. & C. Railroad Co.,* 100 Tenn. 138, 143, 44 S.W. 670, 671, after quoting the first three clauses of Art. II, Section 29, that opinion states:

"Here are three sentences or clauses. The first, which constituted the whole of that section in the constitution of 1834, states, generally, the purposes for which the legislature may 'authorize' counties and incorporated towns to impose taxes. The second and third, which originated with the constitution of 1870, and were designed to cut off existing evils, and prevent their recurrence, define certain things which no county, town, or city may do *in the exercise of such authority when granted, except upon a prescribed condition.*"

The other case in which there appears to be a statement contrary to the above is *Azbill v. Lexington Mfg. Co.,* supra. On page 483, of 188 Tenn., on page 525 of 221 S.W. 2d it is stated:

"*Ferrell v. Doak,* supra, is controlling here. That case makes it clear that the town of Lexington is without authority to expend the tax money in the construc-

tion of this factory, or to give its credit to this private corporation without first having been authorized to submit and then submitting the matter to and procuring the approval of the voters as required by Article 2, Section 29 of our Constitution. * * *''

The result in that case was correct for two reasons: first, because under *Ferrell v. Doak,* it was not a *corporate* purpose and second, even if it had been a corporate purpose, there was *no* provision for an *election* by the people of the town of Lexington. It is so well settled and so fundamental that the public taxes or, which is the same thing, the public credit can not be donated or applied to anything but a public use or corporate purpose that this statement in the Azbill case can not be construed otherwise than as an inadvertence. No such thing could be done even if the vote of the people was 100%, because, if they could vote a gift to one individual or corporation, they could likewise vote a gift to each citizen or corporation in the city or the county, which, of course, was never contemplated by the constitutional provision and could wreck the economy of any city or county or State.

■ Taxation is a mode of raising revenue for *public purposes only. Taylor McBean & Co. v. Chandler,* 56 Tenn. 349.

This is so even when there is no express restriction in the Constitution and such a constitutional provision is simply declaratory of the common law. 84 C.J.S. Taxation secs. 13, 14, p. 64. Also, 51 Am.Jur. 372, sec. 321 et seq.

■ A governmental body can not lend its credit or subscribe for stock or issue bonds without the possibility

that, in the absence of funds on-pay-day, it may have to raise funds by taxation. See Judge Turley's statement in *Nichol v. Mayor of Town of Nashville,* supra, 28 Tenn. at pages 264-265.

■ The result of the foregoing is that assignment No. 3 must be sustained. We have deemed it necessary to dispose of this assignment first, because if the fact alone that more than three-fourths of the qualified voters of the city of Lebanon had voted in favor of the foregoing proceedings was a sufficient compliance with said second paragraph of the constitutional provision in question, then there would be no necessity for considering the first proposition raised, that is, whether the proposed venture is a corporate purpose.

■ Coming now to the more difficult question of what is a corporate purpose, there is no need to refer to the number of Tennessee cases which deal with corporate purposes or county purposes, because they have been collated in *Berry v. Shelby County,* supra, on page 541 and page 542 of 139 Tenn., on page 750 of 201 S.W. and our own cases declare that what is a county or corporate purpose is incapable of an exact and all-inclusive definition and that each case must turn upon its own facts. That is the universal rule, see 8 Vand.L.R., 732, et seq.; 51 Am. Jur. 377, sec. 326, et seq.; 84 C.J.S. Taxation sec. 15 et seq., p. 65. In the early case of *Nichol v. Mayor of Town of Nashville,* 28 Tenn. 252, the Court said in part:

"They are or may be made to be as numerous and diversified as may be found requisite by experience to promote the peace, health, comfort and prosperity of its corporators, and anything which promotes these things is or may be constituted a legitimate corporate

purpose. Perhaps I might divide corporate purposes into two classes: those which are direct and those which are indirect. A direct corporate purpose might be styled to be which, in its direct and immediate consequences, operates upon the interests of the corporation. Such would be all police regulations for the government of the town, the promotion of good order, the protection of its citizens from the lawless, the suppression of vice, the opening and preservation of highways, streets, and alleys, the erection of market-houses and hospitals, supplying the town with water, etc. And indirect corporative purpose might be styled to be one which does not, in its direct and immediate consequences, operate upon the corporations but the beneficial effects of which are to be experienced in a remoter degree, and which have to be traced to their source before they can be duly comprehended and appreciated. Such are all facilities of canals, roads, the improvement of rivers, by which their navigable use is extended, by all which the commercial interest of a town is increased and expanded by reason of the increased facilities of communication thus furnished, by means of which the wealth of its population, individually, and collectively, is increased, with a consequent increase of the comforts and enjoyments of life.''

In one of the later cases involving a condemnation proceeding, that is, *Knoxville Housing Authority, Inc., v. City of Knoxville,* 174 Tenn. 76, 83, 123 S.W. 2d 1085, 1087, the late Mr. Chief Justice Green, after stating the insistence of the property owners whose property was about to be condemned, that the Housing Authority was not a public use, had this to say:

"The courts reason that the primary object of all government is to foster the health, morals and safety of the people. That slum districts with their filthy, congested, weather-exposed living quarters are breeding places of disease, immorality and crime. The character of the houses in such districts make of them a fire hazard. The existence of such districts depresses the taxable value of neighboring property and deprives the State of revenue. The State is also put to great expense in combating disease, crime and conflagration originating in such localities. They menace not only the health, safety and morals of those living therein, but since disease, crime, immorality and fires can with difficulty be confined to points of origin, these districts are a menace to the whole community—indeed, a menace to the State.

"Without dissent, therefore, the courts have reached the conclusion that slum clearance was a *public purpose* and that Housing Authorities serve a *public use.* * * *"

In spite of the broad definitions of the preceding two cases, as well as cases in our State intervening those two, the traditional concept has been that taxation to aid private concerns and individuals has customarily been accepted as not being for a public purpose, 51 Am.Jur. 408, sec. 372; *Citizens' Savings & Loan Ass'n v. City of Topeka,* 1874, 20 Wall. 655, 87 U.S. 655, 22 L.Ed. 455, cited in 8 Vand.L.R., 734, *supra.* Our own case of *Ferrell v. Doak,* supra, 1925, followed the above majority view and cited the above mentioned Topeka case, as well as others holding the same view. This case, at first blush, would seem to be conclusive of the question here in the instant case.

We are of opinion, however, that the instant case can be soundly distinguished from that case. In the first place, the authority for the attempted issue and sale of $200,000 of bonds was a Private Act relating to the city of Lebanon alone. It did not purport to express any public policy of the State. Second, it did not undertake to set out any standards or checks for guiding the authorities who are to have charge of the making of the contracts for the necessary land, or the contracts for the buildings, or for the leasing of the buildings when completed, nor any of the other similar matters contained in the present Act under consideration. It does not appear from the opinion whether the provision of the Private Act requiring a vote of the citizens of Lebanon was complied with or not. The fact that it was not mentioned in the opinion, however, and that the case was decided on the broad principle that it was not a corporate purpose would more strongly indicate that there was an election, for otherwise that point would have in all probability been raised.

Again, there was a mere recitation in the first section that it was necessary to properly protect the industrial interests of a city by having these buildings available for any factories, mills or manufacturing plants who might wish to locate there and that same would increase the business interests of the community and bring in new citizens but there is no indication of any crisis, so to speak, involved in the factual situation. Moreover, another object recited was that it was not right and proper for any citizens to spend their money for the housing of such industries as might want to come to the town and that the burden should be distributed over all taxpayers and citizens.

514

On the other hand, 30 years later we have a Public Act, the one under discussion, which in Section 3 thereof clearly describes the evils which demand corrective public action and expressly and emphatically declares the public policy of the State and in subsection (h) thereof declares "that the means and measures herein authorized to promote said enterprises are, as a matter of public policy, for the public purposes of the several municipalities, and the State of Tennessee."

Then Section 8 provides for the findings that must be made by the State committee which is set up by Section 6 before a county or a city may undertake to consummate a transaction authorized by this statute, and before the bonds can be approved by a vote of the citizens, they must be approved by the State Building Committee.

Then with the showing made by the allegations in the answer which must be taken as true on a hearing on a bill and answer, we have presented to us a situation that is quite different from that existing 30 years ago. It is the difference between a mere incident and a virtual crisis. Thus becomes applicable the principle of constitutional law that a legislative enactment may be held unconstitutional under one set of facts and constitutional under another set of facts as illustrated by the authorities cited in the brief. *Kansas City So. R. Co. v. Anderson,* 233 U.S. 325, 34 S.Ct. 599, 58 L.Ed. 983; *Chastleton Corp. v. Sinclair,* 264 U.S. 543, 44 S.Ct. 405, 68 L.Ed. 841; *Nashville Chattanooga & St. Louis Ry. v. Walters,* 294 U.S. 405, 55 S.Ct. 486, 79 L.Ed. 949, the last being a case arising in this State. Hence, we do not overrule *Ferrell v. Doak,* supra.

This Court will take judicial notice of the change

in the agricultural economy of this section of the country due in a large measure to the mechanization of farm operations, thus causing the country people to move to the towns and cities where work is available and, if work is not available in those places within the State, then the emigration occurs to other states, principally where industrial jobs and a weekly payroll are available.

Under such conditions as are made to appear herein, as well as what is judicially known by this Court, is the State held to be powerless and to be forced to remain supine and impotent? We think not.

██ ██ It is axiomatic and a fundamental principle of representative government that the power of the Legislature is restricted only by the Constitution of the State. It is also a fundamental rule that an act of the Legislature will be upheld if it can be justified upon any rational ground. *Joyner v. Priest,* 173 Tenn. 320, 117 S.W. 2d 9.

In *Citizens' Savings & Loan Ass'n v. City of Topeka,* supra, 22 Wall. 664, 87 U.S. 664, it is said:

"It is undoubtedly the duty of the legislature which imposes or authorizes municipalities to impose a tax to see that it is not to be used for purposes of private interest instead of a public use, and the courts can only be justified in interposing when a violation of this principle is clear and the reason for interference cogent."

In *Davis v. City of Taylor,* 1934, 123 Tex. 39, 67 S.W. 2d 1033, 1034, the Texas Supreme Court said:

"Unless a court can say that the purposes for which public funds are expended are clearly not public purposes, it would not be justified in holding invalid a

legislative act or provision in a city charter providing funds for such purposes.''

In *People ex rel. Thompson v. Chicago & N. W. Ry. Co.,* 1947, 397 Ill. 319, 74 N.E. 2d 510, 512, the Court said:

''To justify a court in declaring a tax invalid on the ground that it was not imposed for a public purpose, the absence of a public interest must be clear and palpable.''

See, also, *State ex rel. Thomson v. Giessel,* 1953, 265 Wis. 207, 60 N.W. 2d 763.

■ It is a widely known fact that the North and East have been losing industry to the South and West in this country; that industry is being located in States where all things are most favorable; that population shift is controlled by the location of industry. The result is, as reflected by the record herein, the matter of inducing industry to locate in this State has become a matter of great public concern, as so made to appear in Section 3 of the questioned Act.

The modern tendency is to meet that challenge by appropriate legislation. See *Albritton v. City of Winona,* 181 Miss. 75, 178 So. 799, 115 A.L.R. 1436; *Dyche v. City of London, Ky.,* 288 S.W. 2d 648; *Miller v. Policy Jury of Washington Parish,* 226 La. 8, 74 So. 2d 394; *Carmichael v. Southern Coal & Coke Co.,* 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245.

The alternative of the failure to do so is to make probable a gradual lowering of the standard of living of the mass of citizens of this State. An inadequate number of jobs means an oversupply of labor, which usually results

ultimately in a lowering of wages. Low wages and unemployment are twin evils that usually lead to a sub-standard diet, hunger, ill health and even crime.

To provide against such evils is clearly a public or corporate purpose. To accomplish that purpose, the legislature may provide any method or means not prohibited by the Constitution, State or Federal. By the within statute it is sought to be accomplished by authorizing a city or a county, acting under reasonable safeguards provided by the statute, to lend its aid to a private corporation, if approved by vote of the people in accordance with the second section of Art. II, Section 29.

We do not conceive that *Holly v. City of Elizabethton*, 193 Tenn. 46, 241 S.W. 2d 1001, or *Darnell v. Montgomery County*, 202 Tenn. 560, 308 S.W. 2d 373, are relevant to either question in this case.

In the light of the foregoing factual situation and the authorities referred to, we are of opinion that Ch. 209, Public Acts of 1955, is a valid enactment and that said statute and the proceedings of the town of Lebanon thereunder are not in violation of Art. II, Section 29 of the Constitution of this State.

The assignment to the contrary is overruled and the decree of the Chancellor as modified is affirmed. The costs will be paid by the City of Lebanon.

NEIL, CHIEF JUSTICE, and PREWITT, JUSTICE, dissent.

Appendix A

Public Chapter No. 209

Senate Bill No. 501

By

Maddox

Industrial Building Bond Act

An Act authorizing any county or incorporated city or town of this State individually or jointly to construct, acquire, purchase, reconstruct, improve, better or extend industrial buildings; providing for the leasing or rental of such buildings to industrial concerns; authorizing and regulating the issuance of revenue and revenue deficiency bonds for financing such industrial buildings; providing for the payment of such bonds, including authority to pledge the full faith and credit of the county or incorporated city or town; providing for the rights of the holders of such bonds; and establishing a Building Finance Committee of the Tennessee Industrial and Agricultural Development Commission and providing for the appointment, powers and duties thereof.

Section 1. Be it Enacted by the General Assembly of the State of Tennessee, That this Act may be cited as "The Industrial Building Bonds Act of 1955."

Section 2. Be it Further Enacted, That whenever used in this Act, unless a different meaning clearly appears from the context,

(1) The term "industrial building" shall mean any one or combination of two or more buildings or structures to be used as a factory, mill, shop, processing plant,

assembly plant, or fabricating plant, to be rented or leased to an industrial concern by the municipality, and the term "enterprise" shall mean the industrial operation or operations to be carried on in such industrial building.

(2) The term "municipality" shall include any county, or incorporated city or town of the State.

(3) The term "governing body" shall include bodies and boards, by whatsoever names they may be known, charged with the governing of a municipality.

Section 3. Be it Further Enacted, That it is hereby determined and declared that the purpose of this Act is to do that which the State Welfare demands, and the State public policy requires:

(a) That the migration and loss of the people of Tennessee, who are compelled to leave the territorial limits of the State, daily, weekly, monthly and yearly to obtain employment and earn a livelihood be retarded and reduced.

(b) That the conditions of unemployment existing State-wide in Tennessee be relieved thereby reducing the evils attendant thereto.

(c) That the average family income in Tennessee be raised and increased as much as possible, but to an amount at least the average over the United States.

(d) That a means be provided for the citizens of communities to promote and develop industry in their areas, when it is impossible for them to do so in their separate and individual capacities.

(e) That a balanced economic development highly essential to the welfare of this State be promoted.

(f) That the reconversion from war time and civil defense economy to peace time pursuits be expedited by a program for readjustment of employment to accord with employment problems necessarily arising from changed conditions.

(g) That the present and prospective health, safety, morals, pursuit of happiness, right to gainful employment and the general welfare of the citizens demand as a public purpose, the development within Tennessee of commercial, industrial, agricultural and manufacturing enterprises by the several municipalities.

(h) That the means and measures herein authorized to promote said enterprises are, as a matter of public policy, for the public purposes of the several municipalities, and the State of Tennessee.

(i) That the present and prospective promotion of health, safety, morals, pursuit of happiness, right to gainful employment, and the general welfare of the State requires the measures that are herein and hereby authorized, and to that end will afford ready and attractive markets for farm and garden products, for the development of natural resources, and for the conversion of raw materials of farm, mine and forest into finished products for the general welfare of each of said municipalities, and the entire people of the State.

(j) That the accomplishment of the things herein authorized to be done by the several municipalities will give to them local benefits peculiar to each, and general benefits to the entire State.

Section 4. Be it Further Enacted, That in addition to powers which it may otherwise have in its charter or the laws of this State, any municipality shall have the power under this Act, subject to the conditions, limitations and restrictions herein provided:

(1) To construct, acquire by gift or purchase, reconstruct, improve, better or extend any industrial building within or without the municipality or partially within or partially without the municipality, but in no event farther than ten miles from the territorial boundaries of such municipality, and to acquire by gift or purchase lands or rights in land in connection therewith.

(2) To issue its bonds to finance in whole or in part the cost of the acquisition, purchase, construction, reconstruction, improvement, betterment or extension of any industrial buildings, including the acquisition of lands or rights in land in connection therewith. The governing body of the municipality in determining such cost may include all cost and estimated cost of the issuance of said bonds, all engineering, inspection, fiscal and legal expenses, and interest which it is estimated will accrue during the construction period and for six months thereafter on money borrowed or which it is estimated will be borrowed pursuant to this Act.

(3) To rent or lease such industrial buildings to industrial concerns in such manner that rents to be charged for the use of the industrial buildings shall be fixed and revised from time to time so as to produce income and revenues sufficient to provide for the prompt payment of interest upon all bonds issued hereunder and to create a sinking fund to pay the principal of such bonds when

due, and to provide for the operation and maintenance of such industrial buildings and for an adequate depreciation account in connection therewith.

(4) To pledge to the punctual payment of bonds authorized hereunder and interest thereon the income and revenues to be received from each industrial building (including improvements, betterments, or extensions thereto thereafter construed or acquired) sufficient to pay said bonds and interest as the same shall become due and to create and maintain reasonable reserves therefor.

(5) To further make certain the punctual payment of bonds authorized hereunder, and interest thereon, by pledging therefor the full faith and credit of the municipality under the conditions, restrictions and limitations hereafter set forth.

(6) To issue its bonds to refund in whole or in part, bonds theretofore issued by such municipality under authority of this Act.

Section 5. Be it Further Enacted, That the construction, acquisition, reconstruction, improvement, betterment, or extension of any industrial buildings may be authorized under this Act and bonds may be authorized to be issued under this Act to provide funds for such purpose or purposes or for the refunding of bonds theretofore issued under this Act, by resolution or resolutions of the governing body which may be adopted at the same meeting at which they are introduced by a majority of all the members thereof then in office and shall take effect immediately upon adoption. Said bonds shall bear interest at such rate or rates not exceeding six (6%) per centum per annum, payable semi-annually, may be in one

or more series, may bear such date or dates, may mature at such time or times not exceeding forty (40) years from their respective dates, may be payable in such medium of payment at such place or places, may carry such registration privileges, may be subject to such terms of redemption with or without premium, may be executed in such manner, may contain such terms, covenants, and conditions, and may be in such form, either coupon or registered, as such resolution or subsequent resolutions may provide. Said bonds may be sold in such manner and upon such terms as may be deemed advisable by the governing body, provided, however, that in no event shall such bonds be sold or delivered on a basis of interest cost to the municipality in excess of six (6%) per cent per annum computed to maturity according to standard tables of bond values, and provided further that bonds for refunding purposes shall not be sold at less than par, but may be delivered in exchange for bonds to be refunded thereby. Pending the preparation of the definite bonds, interim receipts or certificates in such form and with such provisions as the governing body may determine may be issued to the purchaser or purchasers of bonds sold pursuant to this Act. Said bonds and interim receipts or certificates shall be fully negotiable within the meaning of and for all purposes of the Uniform Negotiable Instrument Law of the State.

Section 6. Be it Further Enacted, That, providing such has not been accomplished under another Act of the State of Tennessee, there is hereby created in the Tennessee Industrial and Agricultural Development Commission, hereinafter referred to as the "Commission," a Building Finance Committee hereinafter referred to as

the "Committee," which shall exercise the powers and duties and discharge the responsibilities enumerated herein for such Committee, subject to such review and rules and regulations as may be prescribed by the Commission. Said Committee shall consist of the Chairman of the Commission, serving ex officio as Chairman of the Committee, and six (6) additional members appointed by the Governor, two (2) from each of the three (3) geographical divisions of the State, who shall be competent to serve on the Committee by reason of experience in the fields of investment, finance or industry. The term of each appointive member shall be four (4) years; except that in the initial appointment by the Governor, three (3) shall be designated by the Governor to serve for two years. Any vacancy in the appointive membership shall be filled by the Governor for the unexpired term. The members of the Committee shall serve without pay, except for actual expenses incurred in the course of attending to the official business of the Committee.

The Executive Director of the Commission shall serve as Secretary of the Committee, and such additional staff may be assigned or employed as may be deemed necessary by the Committee, to carry out effectively the provisions of this Act.

A majority of the members of the Committee shall constitute a quorum for the transaction of any and all business of the Committee, and one member shall be designated as a Vice-Chairman to preside at meetings and otherwise act as Chairman in the absence of the Chairman.

All orders, findings, acts and certificates of the Committee shall be attested by the signature of the Chairman

or Vice-Chairman, and the Secretary, and when so attested, all orders, acts, findings and certificates of the Committee shall be competent evidence and shall be given full faith and credit in any court or proceedings, and unless affirmatively shown to the contrary, it shall be presumed that the proceedings of the Committee were in all things regular. The Secretary, or in his absence, some person designated by the Secretary to act in his place, shall keep regular and accurate Minutes of the Committee's proceedings, in a Minute Book provided for that purpose, which shall be a public record, and all orders, findings and acts of the Committee shall be entered upon its Minutes. The Committee is authorized and empowered to use and expend such funds as may be made available for its purpose by the Commission.

The Committee shall hold regular meetings at the offices of the Commission, and at such other times and places as its duties may require, with the express authority to adjourn or recess from time to time, and place to place, and to convene special meetings by unanimous consent.

Section 7. Be it Further Enacted, That the Committee is charged with the duty of making effective the declared public policy of the State and municipalities as hereinabove set forth, and for that purpose is hereby authorized and empowered to determine whether the public welfare demands and sound State public policy requires, that any municipality shall have the right to engage in any or all of the rights and privileges enumerated in this Act. Each municipality within this State shall have the right to apply to the Committee for a Certificate of Public Pur-

pose and Necessity from the Committee as to whether the general welfare requires that such municipality enter into a given enterprise.

In determining whether such certificate shall be issued, the Committee may hold public hearings or private hearings, make investigations as may be desired, and shall have power to summon witnesses, administer oaths, hear testimony and make a record of all things had and done at such hearing or investigation, and to order issued such Certificates of Public Purpose and Necessity as the Committee may deem advisable.

Section 8. Be it Further Enacted, That the Committee shall investigate, find and determine upon application of any municipality therefor, as to whether a Certificate of Public Purpose and Necessity shall be issued to such municipality to engage in any of the enterprises deemed essential under the above declared public policy for the economic development and advancement of said municipality, and in considering and determining whether or not such certificate shall issue, the Committee shall find and determine affirmatively the following:

(1) That there are sufficient natural resources readily and economically available for the use and operation of the particular industrial building and enterprise for at least ten years, but in no event less than the period of time for which any bonds may be issued for acquiring or constructing said industrial building.

(2) That there is available a labor supply to furnish at least one and one-half workers for each operative job in said enterprise within an area of twenty-five miles from the proposed location.

(3) That there are adequate property values and suitable financial conditions, so that the total bonded indebtedness of the municipality, solely for the purposes authorized by this Act, shall not exceed ten (10%) per cent of the total assessed valuation of all the property in the municipality ascertained by the last completed assessment at the time of the issuance of such bonds.

When the Committee shall have determined said facts favorably, it is authorized and empowered, having due regard to the promotion of the public policy and the general welfare herein declared, to issue or refuse to issue a Certificate of Public Purpose and Necessity to said municipality to engage in providing said industrial building. If and when such certificate is issued, it shall authorize the particular municipality to do all of the things authorized under Section 4 of this Act, but said Certificate shall expire in twelve (12) months from its date unless within said time such industrial building and enterprise shall have been established, subject, however, to any delays necessitated by any litigation or acts of God, delaying the establishment of said enterprise. Provided, however, that in no event shall the Committee authorize any municipality actually to provide any such industrial building, unless said Committee shall further find and determine that said industrial building and enterprise is well conceived, has a reasonable prospect of success, will provide proper economic development and employment, and will not become a burden upon the taxpayers of the municipality.

If and when said Certificate is issued, the Committee therein shall fix and determine: (1) the extent and the amount to which the municipality may issue bonds or

make expenditures for such industrial building; (2) what property may be acquired therefor; (3) the terms upon which such acquisition may be had, and; (4) what expenditures may be made, and the construction of buildings, and of equipment with its installation, and; (5) the method of lease, rental and operation of said industrial building by said municipality. If the governing body of the municipality fails or refuses to follow the requirements made by the committee in said Certificate, then the members of the governing body of the municipality voting for such failure or refusal shall be individually and personally liable, and liable on their official bonds for any loss that the municipality may sustain by reason of such failure or refusal to follow said requirements, and in addition may be compelled by injunction to comply with such requirements.

The Committee is hereby authorized and empowered to adopt and put into effect all reasonable rules and regulations that it may deem necessary to carry out the provisions of this Act, not inconsistent herewith.

Section 9. Be it Further Enacted, That the governing body of any municipality desiring to enter into the plan herein authorized, after receiving a Certificate of Public Purpose and Necessity from the Committee, as provided by this Act, by resolutions spread upon its Minutes, shall declare its intention of entering into such plan, and prior to the delivery and payment for any bonds authorized under the provisions of this Act a three-fourths majority of the qualified voters of such municipality voting at an election on the special question of issuing such bonds shall approve of such Bond Issue, provided that no such election shall be necessary in con-

nection with the authorization of refunding bonds under the provisions of this Act. Said election shall be called by resolution of the governing body and shall be held in the same manner and by the same officials as general municipal elections and notice thereof shall be given by publication not less than two times in a newspaper of general circulation in such municipality, the first of which publications shall be made not less than 20 days prior to the date of such election. No other notice shall be necessary. It shall not be necessary to submit to the voters any question other than the maximum amount of bonds to be issued and the purpose therefor. It shall be the duty of the governing body of such municipality to enter upon its minutes the results and returns of such election, and after the delivery of any bonds voted upon at such election and payment therefor such entry upon its minutes shall be conclusive evidence of the result of such election, and no suit, action or other proceeding contesting the validity of such election shall be entertained in any of the courts of the State thereafter. If such election results unfavorably to the proposition then no second or other election shall be ordered or held until the Committee shall determine that such election may be held.

Section 10. Be it Further Enacted, That any resolution authorizing the issuance of bond under this Act may contain covenants as to (a) the use and disposition of the rentals from the industrial building for which said bonds are to be issued, including the creation and maintenance of reserves; (b) the issuance of other or additional bonds payable from the income and revenues from such industrial building; (c) the maintenance and repair of such industrial building; (d) the insurance to be carried there-

on and the use and disposition of insurance monies; and (e) the terms and conditions upon which the holders of said bonds, or any portion thereof or any trustees therefore, shall be entitled to the appointment of a receiver by the Chancery Court, which Court shall have jurisdiction in such proceedings, and which receiver may enter and take possession of said industrial building and lease and maintain same, prescribe rentals and collect, receive, and apply all income and revenues thereafter arising therefrom in the same manner and to the same extent as the municipality itself might do. The provisions of this Act and any such resolution or resolutions shall be a contract with the holder or holders of said bonds and shall continue in effect until the principal of and the interest on the bonds so issued shall have been fully paid, and the duties of the municipality and its governing body and officers under this Act, and any such resolution or resolutions shall be enforceable by a bondholder by mandamus, or other appropriate suit, action or proceedings in any court of competent jurisdiction.

Section 11. Be it Further Enacted, That said bonds bearing the signatures of officers in office on the date of the signing thereof shall be valid and binding obligations, notwithstanding that before the delivery thereof and payment therefor any or all the persons whose signatures appear thereon shall have ceased to be officers of the municipality issuing the same. The validity of said bonds shall not be dependent on nor affected by the validity or regularity of any proceedings relating to the acquisition, purchase, construction, reconstruction, improvement, betterment, or extension of the industrial building for which said bonds are issued. The resolution authorizing said

bonds may provide that the bonds shall contain a recital that they are issued pursuant to this Act, which recital shall be conclusive evidence of their validity and of the regularity of their issuance.

Section 12. Be it Further Enacted, That all bonds issued hereunder shall have a lien upon the rentals from the industrial building for which said bonds have been issued, and the governing body may provide in the resolution or resolutions authorizing such bonds for the issuance of additional bonds to be equally and ratably secured by a lien upon such rentals or may provide that the lien upon such rentals for future bonds shall be subordinate.

Section 13. Be it Further Enacted, That in order to secure the payment of any of the bonds issued pursuant to this Act, and interest thereon, or in connection with· such bonds, any municipality shall have the power as to such bonds to pledge in addition to all other revenues and funds provided for herein, the full faith and credit and unlimited taxing power of the municipality to the punctual payment of the principal of and interest on such bonds, subject to the provisions of this Act. In the event such pledge of full faith and credit and unlimited taxing power of the municipality is given any holder or holders of the bonds, including a trustee or trustees for holders of such bonds, shall have the right, in addition to all other rights, by mandamus or other suit, action or proceedings in any Court of competent jurisdiction to enforce his or their rights against the municipality, and the governing body of the municipality and any officer, agent or employee of the municipality, including, but not limited to, the right to require the municipality and governing body and any

proper officer, agent or employee of the municipality, to assess, levy and collect taxes and other revenues and charges adequate to carry out any agreement as to, or pledge of, such taxes, revenues and charges. The taxes herein authorized to be pledged shall be levied without limit as to rate or amount upon all taxable property within the municipality, and all such taxes to be levied are hereby declared to have been levied for county and corporation purposes, respectively, within the meaning of Section 29, Article 2 of the Constitution of the State of Tennessee.

Section 14. Be it Further Enacted, That the governing body of a municipality issuing bonds pursuant to this Act shall prescribe and collect rentals for industrial buildings and shall revise same from time to time whenever necessary so that the income and revenues to be derived from such rentals will always be sufficient to pay when due all bonds and interest thereon for the payment of which such revenues are pledged, including reserves therefor, and to provide for all expenses of operation, maintenance, and depreciation charges of such industrial buildings. All funds arising under the provisions of this Act shall be kept separately and apart from other funds of the county, city or town, as the case may be.

Section 15. Be it Further Enacted, That all bonds issued pursuant to the provisions of this Act and the income therefrom shall be exempt from all state, county and municipal taxation, except inheritance, transfer and estate taxes.

Section 16. Be it Further Enacted, That bonds issued under the authority of this Act and secured by a pledge of full faith and credit shall be and are hereby declared

to be legal and authorized investments for banks, savings banks, trust companies, building and loan associations, insurance companies, fiduciaries, trustees, guardians and for all public funds of the State of Tennessee, including but not limited to the sinking funds of cities, towns, villages, counties, school districts, or other political corporations or subdivisions of the State of Tennessee. Such bonds shall be eligible to secure the deposit of any and all public funds of the State of Tennessee and any and all public funds of cities, towns, villages, counties, school districts or other political corporations or subdivisions of the State of Tennessee, and such bonds shall be lawful and sufficient security for said deposits to the extent of their value when accompanied by all unmatured coupons appertaining thereto.

Section 17. Be it Further Enacted, That counties and municipalities may exercise jointly the powers and authorities herein conferred upon them individually.

Section 18. Be it Further Enacted, That the powers conferred by this Act shall be in addition and supplemental to, and the limitations imposed by this Act shall not affect the powers conferred by any other general, special or local law. Industrial buildings may be acquired, purchased, constructed, reconstructed, improved, bettered, and extended, and bonds may be issued under this Act for said purposes, notwithstanding that any general, special, or local law may provide for the acquisition, purchase, construction, reconstruction, improvement, betterment and extension of a like industrial building, or the issuance of bonds for like purposes, and

without regard to the requirements, restrictions, limitations or other provisions contained in any other general, special or local law.

Section 19. Be it Further Enacted, That if any provision of this Act, or the application of such provision to any persons, body or circumstances shall be held invalid, the remainder of this Act, or the application of such provision to persons, bodies or circumstances other than those as to which it shall have been held invalid, shall not be affected thereby.

Section 20. Be it Further Enacted, That this Act shall take effect from and after its passage, the public welfare requiring it.

Passed: March 7, 1955

Jared Maddux
*Speaker of the Senate*

James L. Bomar
*Speaker of the House*
*of Representatives*

Approved: 3-17-55.

Frank G. Clement
*Governor*

NEIL, CHIEF JUSTICE, (dissenting).

The sum and substance of Chapter 209, Public Acts of 1955, purports to confer upon all municipalities and counties of the State authority to issue revenue and revenue deficiency bonds to finance the erection and leasing of industrial buildings to persons or corporations for use by such industrialists. The Act provides ''for the pay-

ment of such bonds, including authority to pledge the full faith and credit of the county or incorporated city or town'' (Caption of the Act).

Pursuant to this Act the Town of Lebanon has made a contract with Hartmann Luggage Company, a Wisconsin corporation, for the lease for 25 years, with renewal privileges, of a factory building to be constructed by the Town of Lebanon for its use, etc. It has authorized the issuance of bonds in the total amount of $350,000, the same having been approved by the Tennessee Industrial & Agricultural Development Commission, and also by a three-fourths majority of the qualified voters of said Town.

The appellant has questioned the constitutionality of this Act on the ground that it violates Article II, Section 29, of the State Constitution in that it authorizes the levy and collection of taxes upon all the property of citizens in the Town of Lebanon for the support of a private industry, and is not ''for County or Corporation purposes''. In other words, in the instant case the Town of Lebanon is lending its credit to a private corporation and not for a public or municipal purpose.

The Act defines ''industrial building''. Section 3 declares that *''the purpose of this Act is to do that which the State Welfare demands, and the State public policy requires''*. (Emphasis supplied.) Subsection (a) declares that the State of Tennessee is suffering a loss in its population by reason of lack of employment, etc.; (b) ''That the conditions of unemployment existing Statewide in Tennessee be relieved thereby reducing the evils attendant thereto.'' Another purpose appears in sub-

section (c) *"That the average family income in Tennessee be raised and increased as much as possible"*. (Emphasis supplied.)

By other sections there is created an agency called "The Tennessee Industrial and Agricultural Development Commission", also a "Building Finance Committee", clothed with certain duties and responsibilities with regard to the approval or disapproval of municipal or county bonds, designed to give employment to certain of its citizens, and to provide a means of "increasing the average family income" in the county or city affected; also to prevent the loss of population to the State, and more especially the area complaining of unemployment, etc. It is furthermore disclosed as a part of the State's public policy that the State's unemployment problem is such "that there is the resultant evil of hunger and crime" which is sought to be alleviated by this Act.

The Town of Lebanon answered the complainant's bill and insisted that the Act was constitutional in all respects; that the issuance of the bonds was in compliance with the Act herein assailed and that the contract with the Hartmann Luggage Company of Wisconsin was for a public purpose in that it was necessary to the general economic welfare of the Town, i. e. to relieve the unemployment of its citizens. It paints conditions of unemployment in Lebanon as being sorrowful in the extreme.

While the cause was heard on bill and answer, which requires the Court to accept the answer as true, we cannot accept the conclusions therein stated as true. It is a great strain on one's credulity to accept as true the

averment that anybody is hungry in the Town of Lebanon, and that there are the twin evils of disease and crime resulting from unemployment.

Contention is made by counsel for Lebanon that the Act should be held constitutional because it is declaratory of the State's public policy. I readily concede that the Legislature is privileged to declare the public policy of the State, which generally speaking the courts must uphold. But this is true only where the public policy so declared is not contrary to plain constitutional inhibitions.

The present statute goes far beyond anything that was ever contemplated by the framers of our constitution. To be sure the Legislature has authorized cities and counties to establish "poor farms" to care for indigent people who have no home, and have appropriated small sums of money from time to time for this purpose since the early history of the State. But no city or county has ever loaned its credit to any private industry for purposes set forth in that statute. Nor has it ever been thought that measures to "increase the average family income" and to prevent the emigration of its citizens to other States to get a job, or a better paying job, was within the domain of the State's public policy. Moreover, under the provisions of this Act any town or county may by a vote of three-fourths of its citizens vote itself into bankruptcy in order to meet higher wages in the great industrial centers in the north and east. It is a well recognized fact that some responsible Union labor representatives are now insisting upon what is called "a guaranteed annual wage." Can it be said in truth and as a matter of law under the Constitution that any Act purporting to meet

538

such competition is constitutional? The majority opinion apparently holds to this view. To which I must respectfully dissent. Is it at all possible within constitutional limitations for the State to declare as a part of its public policy that the several municipalities of this State are privileged to match wages and hours of employment with the ever increasing wage scale in other states, and impose a tax (the amount not limited) to support it? This problem cannot be solved by any statutory formula, and the same is true in preventing emigration to greener industrial fields.

If the contract between the Town of Lebanon and the Luggage Company is not in aid of a municipal purpose, it cannot be constitutionally made so by three-fourths of the voters in the town in favor of it. If the validity of any Act of the Legislature is to be determined by counting votes in a city election the Constitution has no probative force whatever.

The case at bar is controlled by *Ferrell v. Doak,* 152 Tenn. 88, 275 S.W. 29, 46 A.L.R. 590, wherein this Court held that a Private Act authorizing a tax against the City of Lebanon for the purchase of a box factory was in violation of Article II, Section 29, of the Constitution because it was for a private purpose as distinguished from a "public use". The box factory was not under the control of the town authorities. Neither is the Luggage Company in the case at bar.

The cases of *Azbill v. Lexington Mfg. Co.,* 188 Tenn. 477, 221 S.W. 2d 522, and *Holly v. City of Elizabethton,* 193 Tenn. 46, 241 S.W. 2d 1001, do not support the defendant's contention that even if it were for a private purpose

it was valid because it was favored by a three-fourths vote in the referendum election above referred to.

This Court has never departed from *Ferrell v. Doak,* supra (152 Tenn. 88, 275 S.W. 31), wherein it was held as settled law that "taxation cannot be imposed for the purpose of establishing, aiding, or maintaining private business enterprises whose sole object is the private emolument of the proprietors, *no matter how beneficial to the community such enterprises may be"*, citing numerous authorities. (Emphasis supplied.)

In both the Azbill case and the Holly case the bonds issued were *revenue bonds* to be liquidated by rentals from the industrial buildings. No tax upon the property owners was authorized for this purpose. While the Holly case holds that the lease of an industrial building is "at least incidentally for a public purpose", (193 Tenn. 46, 241 S.W. 2d 1005) there is a clear and justifiable inference that had the Act authorized a tax upon the City of Elizabethton and its citizens to support it the Act would not have been approved.

The issue in this case falls within the narrow compass of what constitutes a public or a governmental purpose. These terms have been defined many times by various law writers, and by our own Court in *Ferrell v. Doak,* supra. When these definitions are considered, even in a technical sense, "a public purpose" is one that affects a political subdivision of the State as a body politic. In other words, it must affect all the people in some material way, not a limited number in a special way.

The case of *Nichol v. Mayor of Town of Nashville,* 28 Tenn. 252, strongly relied on in the majority opinion does

not support the contention of the defendant Town of Lebanon. The holding of the Court in that case by Mr. Justice Turley was that subscription to the stock of the N. C. & St. L. Railway (running from Nashville to Chattanooga) was for a public purpose. The Court was there dealing with a public service corporation. At that time (1847) the City of Nashville as a municipality was in dire need of public transportation. The two cases cited by Judge Turley as supporting authority dealt with public service corporations. Transportation vitally affected the general public.

The case at bar should also be distinguished from *Knoxville Housing Authority, Inc., v. City of Knoxville,* 174 Tenn. 76, 123 S.W. 2d 1085, 1087, where property was sought to be condemned for a "slum-clearance" project. The right to take certain property under the power of eminent domain in aid of the project was well stated by Mr. Chief Justice Green, as follows: "The courts reason that the primary object of all government is to foster the health, morals and safety of the people. That slum districts with their filthy, congested, weather-exposed living quarters are breeding places of disease, immorality and crime." Other good and sufficient reasons were stated by him to which there can be no dissent. But there is no contention by defendant's counsel in the case at bar that the erection of an industrial building in Lebanon, to be used by a private corporation, is essential as a governmental project to prevent "disease, immorality and crime", or for the promotion of public health, morals and the safety of the people.

It is my sincere conviction that the contract between the Town of Lebanon and the Luggage Company is in-

valid because it is in violation of the express provisions of the Constitution of this State in that the erection and maintenance of the industrial building is in aid of a private business.

I respectfully dissent.

PREWITT, JUSTICE (dissenting).

I most respectfully dissent from the majority opinion filed herein. In doing so, I have carefully read *Nichol v. Mayor and Aldermen of Town of Nashville,* 28 Tenn. 252; *Ferrell v. Doak,* 152 Tenn. 88, 275 S.W. 29, 46 A.L.R. 590; *Azbill v. Lexington Mfg. Co.,* 188 Tenn. 477, 221 S.W. 2d 522; and *Holly v. City of Elizabethton,* 193 Tenn. 46, 241 S.W. 2d 1001.

We must keep in mind, I think, that under the Constitution, Article 2, Section 29, which gives the cities the right to levy taxes, that the "corporation purposes respectively," is the only right that the town, or city, has to levy taxes, and it must be for a corporate, or public purpose regardless of the further provisions of the Article of the Constitution in reference to a three-fourths majority voting in the affirmative.

In *Nichol v. Mayor and Alderman of Town of Nashville,* supra, the Court had this to say:

"But be this as it may, we think that the Legislature, most clearly, has no power to delegate to a county or corporate town the power of levying taxes for any other than county or corporation purposes."

Thus the county, or town, has no greater power than the Legislature, and certainly the Legislature would not have any right to levy a tax unless it was for a corporate

purpose. We think the rule and language used by this Court in *Ferrell v. Doak,* 152 Tenn. 88, 275 S.W. 29, 46 A.L.R. 590, which was followed by us in *Azbill v. Lexington Mfg. Co.,* 188 Tenn. 477, 221 S.W. 2d 522, are controlling here.

It seems to me that the views expressed in *Ferrell v. Doak,* supra, and *Azbill v. Lexington Mfg. Co.,* supra, fortify my views.

In the Holly case, the Act in question was held unconstitutional but the court there expressly said that the bonds issued did not pledge the public credit, but only provided that the bonds and interest should be paid by the rentals on the building.

In the present case the public funds of the City of Lebanon are to be turned over and used by a strictly private corporation.

It is further set out in the majority opinion that this plan will help and alleviate the poor by giving them employment. It is true that many people might be benefited by the employment in the organization, but nevertheless we cannot escape the conclusion that public money and the public credit is going into a strictly private organization.

I think this policy is unsound and, if followed, would be dangerous.

I therefore register this dissent.