159 S.E.2d 745 (1968)
273 N.C. 137
George C. MITCHELL, on behalf of himself and all others of the same or like class, Plaintiff-Appellant,
v.
NORTH CAROLINA INDUSTRIAL DEVELOPMENT FINANCING AUTHORITY, a body politic and corporate, and Wayne Corpening, Director of the Department of Administration for the State of North Carolina, G. Andrew Jones, Jr., State Budget Officer for the State of North Carolina, and G. H. Brooks, State Disbursing Officer for the State of North Carolina, Defendants-Appellees.
No. 532.
Supreme Court of North Carolina.
March 6, 1968.
*749 Johnson & Gamble, Raleigh, for plaintiff appellant.
Atty. Gen., T. Wade Bruton and Deputy Atty. Gen., Harry McGalliard for Wayne Corpening, G. Andrew Jones, Jr., and G. H. Brooks, defendant appellees.
Herman Wolff, Jr., Raleigh, for North Carolina Industrial Development Financing Authority, defendant appellee.
SHARP, Justice.
This case, brought to test the constitutionality of the North Carolina Industrial Development Financing Act, does not call into question the actual operation of Authority nor does it involve the validity or tax status of any bond issue, for no bonds have been issued. As the Wisconsin court said in State ex rel. Bowman v. Barczak, 34 Wis.2d 57, 148 N.W.2d 683, 687, "The case before us involves only a threshold expenditure. It does not go to the pith of the functions or the operations of an industrial development corporation." The question for decision is whether an initial appropriation of $37,062.00 of tax money from the State's Contingency and Emergency Fund may be made to enable Authority to organize and commence its operations.
N.C.Const. art. V, § 3 provides: "The power of taxation shall be exercised in a just and equitable manner, for public purposes only, and shall never be surrendered, suspended, or contracted away." (Emphasis added.) This limitation of taxing power was contained in the Constitution of 1868 and reaffirmed by the vote of the people in 1962 when Article V, § 3 of the Constitution was revised. The power to appropriate money from the public treasury is no greater than the power to levy the tax *750 which put the money in the treasury. Both powers are subject to the constitutional proscription that tax revenues may not be used for private individuals or corporations, no matter how benevolent. Horner v. Chamber of Commerce, 231 N.C. 440, 57 S.E.2d 789. The crucial question, therefore, is whether Authority was created for a public purpose. If so, it may be activated by the questioned appropriation of tax funds; otherwise not. Britt v. City of Wilmington, 236 N.C. 446, 73 S.E.2d 289.
The initial responsibility for determining what is and what is not a public purpose rests with the legislature, and its findings with reference thereto are entitled to great weight. If, however, an enactment is in fact for a private purpose, and therefore unconstitutional, it cannot be saved by legislative declarations to the contrary. When a constitutional question is properly presented, it is the duty of the court to ascertain and declare the intent of the framers of the Constitution and to reject any legislative act which is in conflict therewith. State v. Felton, 239 N.C. 575, 80 S.E.2d 625; Nash v. Town of Tarboro, 227 N.C. 283, 42 S.E.2d 209; 1 Strong, N.C.Index, Constitutional Law § 10 (1957). The presumption, however, is in favor of constitutionality, and all doubts must be resolved in favor of the act. State v. Furmage, 250 N.C. 616, 109 S.E.2d 563; Wells v. Housing Authority, 213 N.C. 744, 197 S.E. 693. The State's Constitution is a restriction of powers; those powers not surrendered are reserved to the people to be exercised through their representatives in the General Assembly. Therefore, so long as an act is not forbidden, the wisdom of the enactment is exclusively a legislative decision. McIntyre v. Clarkson, 254 N.C. 510, 119 S.E.2d 888; Yarborough v. North Carolina Park Commission, 196 N.C. 284, 145 S.E. 563; Hudson v. City of Greensboro, 185 N.C. 502, 117 S.E. 629. If the use is public, the expediency or necessity for establishing it is exclusively for the legislature. Dennis v. City of Raleigh, 253 N.C. 400, 116 S.E.2d 923; Redevelopment Commission of Greensboro v. Security National Bank, 252 N.C. 595, 114 S.E.2d 688; Nash v. Town of Tarboro, supra; Wells v. Housing Authority, supra; Yarborough v. North Carolina Park Commission, supra.
A slide-rule definition to determine public purpose for all time cannot be formulated; the concept expands with the population, economy, scientific knowledge, and changing conditions. As people are brought closer together in congested areas, the public welfare requires governmental operation of facilities which were once considered exclusively private enterprises, Fawcett v. Mt. Airy, 134 N.C. 125, 45 S.E. 1029, 63 L.R.A. 870, and necessitates the expenditure of tax funds for purposes which, in an earlier day, were not classified as public. Keeter v. Town of Lake Lure, 264 N.C. 252, 141 S.E.2d 634. Often public and private interests are so comingled that it is difficult to determine which predominates. It is clear, however, that for a use to be public its benefits must be in common and not for particular persons, interests, or estates; the ultimate net gain or advantage must be the public's as contradistinguished from that of an individual or private entity. Briggs v. City of Raleigh, 195 N.C. 223, 141 S.E. 597.
"It has been said that the term `public purpose' is merely a classification distinguishing objects for which the government is to provide from those which are left to private inclination, interest, or liberality. A private enterprise, on the other hand, is one which is ordinarily pursued by individuals in cultivating the soil, manufacturing articles for sale, dealing in merchandise, and the various and numerous other activities which enlist individual energy in a complex and advancing civilization. * * * The term `public purpose,' as used in a constitutional provision that taxes shall be levied for public purposes only, is synonymous with `governmental purpose' in the broad connotation given the latter term under the modern concept of government and the relation between government and society." 51 Am.Jur. Taxation § 326 (1944).
*751 This Court has, on at least two occasions, quoted with approval the following creed: "`If there is any restriction implied and inherent in the spirit of the American Constitutions, it is that the government and its subdivisions shall confine themselves to the business of government * * *.' 38 Am.Jur., Municipal Corporations § 395." Bobbitt, J., in Dennis v. Raleigh, supra, 253 N.C. at 403-404, 116 S.E.2d at 926; Denny, J. (later C.J.), in Nash v. Town of Tarboro, supra, 227 N.C. at 285, 42 S.E.2d at 211. When we have approved this statement, however, we are back where we started. What is the business of government? To say that it is a proper function of the State to promote the health, safety, morals, and general welfare of the community is quite true, Fawcett v. Mt. Airy, supra, but it is not to decide a particular case. Is it today a proper function of government for the State to provide a site and equip a plant for a private industrial enterprise?
In the interstate competition for industry, an overwhelming majority of the states now authorize the use of industrial development bonds. Although the plans vary in detail, they are basically the same. Local governmental units, or some agency of the state created for this specific purpose, pay for a site and construct a plant with funds derived from the issuance of revenue bonds. The facility is then leased to a manufacturer whose rental payments are used to retire the bonds. When the bonds are paid, the industry, if it so desires, may exercise an option to buy the facility or it may continue to lease it, depending upon its agreement with the lessor. This arrangement enables the manufacturer to expand or relocate without a heavy investment of its own capital. For a history of the inception and growth of governmental aid financing, see Abbey, Municipal Industrial Development Bonds, 19 Vand.L.Rev. 25 (1965); Pinsky, Public Industrial Financing, 111 U.Pa.L.Rev. 265 (1963). See Notes, 59 Col.L.Rev. 619, 629 (1959) & Vand.L.Rev. 621 (1961); Bridges, State and Local Inducements for Industry, 18 Nat'l Tax J. 1 (1965).
At the time the General Assembly passed the Act, it declared in Resolution No. 52, that it considered the Act bad public policy. It explained that it felt compelled to authorize industrial revenue bonds in order to compete for industry with neighboring states which use them. As proof of its reluctance to join the industry-subsidizing group of states, the General Assembly requested the President and the other fortynine states to petition Congress to make the interest on all such bonds thereafter issued subject to all applicable income-tax laws.
"It is the Internal Revenue Code of 1954, not the public credit, which makes industrial development bonds work. * * * The issuing sources of the revenue bonds would be immaterial if the same federal tax benefits could otherwise be obtained." Note, Industrial Development Bonds: Judicial Construction vs. Plant Construction, 15 U.Fla.L.Rev. 262, 296 (1962). See also Herring & Miller, Florida Public Bond FinancingComments on the Constitutional Aspects, 21 U.Miami L.Rev. 1, 30 (1966).
Section 103(a)(1) of the Internal Revenue Code of 1954 provides that gross income does not include interest on the obligations of a state, a territory, or a possession of the United States, or of any political subdivision of the foregoing. Under revenue rulings, income from revenue bonds which are obligations of a political subdivision is excluded "notwithstanding the fact that the bonds were issued to finance the construction of industrial plants for lease to private concerns," with payment to be made from the revenues of the lease rather than the general revenues of the municipality. Michie's Federal Tax Handbook 631 (1966); Revenue Ruling 54-106, 1954-1 CB 28; 1 Merton, Law of Federal Income Taxation § 8.17 (1962). See also Revenue Ruling 57-187, 1957-1 CB 65; Revenue Ruling 63-20, 1963-1 CB 24.
Because the interest on revenue bonds of a state agency is excluded from federal and *752 state income taxes, the rate is generally lower than that which private borrowers pay, and this saving is usually passed to the industry in the form of lower rentals. Furthermore, rental payments are deductible under both federal and state laws as an operating expense. By buying the bonds itself, it is possible for an industry to realize a net profit on its occupancy of the facility in consequence of a net tax savings resulting from rent deductions and receipt of nontaxable interest-income. For figures showing this accomplishment, see Note, 15 U.Fla.L.Rev. 262 at 269-270 (1962). See also Note, The "Public Purpose" of Municipal Financing for Industrial Development, 70 Yale L.J. 789 (1961).
Since the tax advantage is the primary appeal which these industrial bonds make to purchasers, the elimination of this status would curtail their use to finance private business expansionas the General Assembly recognized in Resolution 52. The Supreme Court of Wyoming also noted this fact when it passed upon the constitutionality of the Wyoming Industrial Development Project Act in Uhls v. State, 429 P.2d 74. It said: "Such financing (industrial revenue bonds) has been resorted to because municipal bonds are exempt from Federal taxation, and small communities have been able to use this tax-exempt status to encourage local industrial development. No doubt it is only a matter of time until Congress will see fit to remove tax exemptions for municipal revenue bonds." Id. at 82. Bills to end the tax-exempt status of industrial aid bonds have been introduced in Congress. 5 Nation's Cities 29 (1967); Note, 20 Vand.L.Rev. 685 (1967).
According to an item in Newsweek, January 29, 1968, p. 59: "The Treasury Department and the Securities and Exchange Commission will campaign this year for a crackdown on the growing use of tax exempt industrial revenue bonds to finance private business expansion. During 1967, the worth of such bonds issued by state and local governments exceeded $1 billion." The National League of Cities and the North Carolina League of Municipalities say that tax-free revenue bonds pose a growing threat to the financial stability of city government; that they amount to a subsidy to "blue ribbon" industry; that they compete with general-purpose municipal bonds, thereby reducing the market and raising the interest rates on such bonds; and that they endanger the entire tax-exempt status accorded income from governmental bonds. Southern City, February 1967; 5 Nation's Cities 29 (Dec.1967); Spiegel, Financing Private Ventures with Tax-Exempt Bonds: A Developing "Truckhole" in the Tax Law, 17 Stan.L.Rev. 224 (1965).
Whatever may be the ultimate fate of governmental industrial revenue bonds, our research indicates that at least forty-two states (not counting North Carolina) have held that governmental financing for industrial development serves a public purpose. The courts of the twenty-one jurisdictions listed below have, without constitutional amendments, upheld the validity of legislation authorizing governmental industrial aid bonds or other types of financial assistance. They have either assumed the public purpose of such acts or reasoned as follows: An inadequate number of jobs means an oversupply of labor, which results in low wages. Unemployment and low wages lead to hunger, ill health, and crime. The continued existence of an established industry and the establishment of new industry provide jobs, measurably increase the resources of the community, promote the economy of the state, and thereby contribute to the welfare of its people. The stimulation of the economy is, therefore, an essential public and governmental purpose. The fact that a private interest incidentally benefits from such governmental aid is not fatal if substantial public benefits also result. See generally, Note, The "Public Purpose" of Municipal Financing for Industrial Development, 70 Yale L.J. 789 (1961); Note, 20 Vand.L.Rev. 685 (1967).
*753 Alabama: Newberry v. City of Andalusia, 257 Ala. 49, 57 So.2d 629 (1952) (Public purpose assumed; two justices dissenting); Alaska: DeArmond v. Alaska State Development Corporation, 376 P.2d 717 (1962); Connecticut: Roan v. Connecticut Industrial Building Commission, 150 Conn. 333, 189 A.2d 399 (1963) (State Industrial Building Commission to insure mortgages on industrial projects); Delaware: In re Opinion of the Justices, 4 Storey 366, 54 Del. 366, 177 A.2d 205 (1962) (Act held for a public purpose without reliance on Const. art. VIII, § 4 allowing public money to be appropriated to private corporations upon vote of three-fourths of all members of the General Assembly); Iowa: Green v. City of Mt. Pleasant, 256 Iowa 1184, 131 N.W.2d 5 (1964); Kansas: State ex rel. Ferguson v. City of Pittsburg, 188 Kan. 612, 364 P.2d 71 (1961); Kentucky: Faulconer v. City of Danville, 313 Ky. 468, 232 S.W.2d 80 (1950); see also Industrial Development Authority v. Eastern Kentucky Reg. Pl.Comm. (Ky.C.A.) 332 S.W.2d 274 (1960); Maryland: City of Frostburg v. Jenkins, 215 Md. 9, 136 A.2d 852 (1957) (One Justice dissenting); Michigan: City of Gaylord v. Beckett, 378 Mich. 273, 144 N.W.2d 460 (1966) (One dissent); Mississippi: Albritton v. City of Winona, 181 Miss. 75, 178 So. 799, 115 A.L.R. 1436 (1938), appeal dismissed, 303 U.S. 627, 58 S.Ct. 766, 82 L.Ed. 1088; New Hampshire: Opinion of the Justices, 106 N.H. 237, 209 A.2d 474 (1965); Opinion of the Justices, 103 N.H. 258, 169 A.2d 634 (1961); Cf. In re Opinion of the Justices, 99 N.H. 528, 114 A.2d 514 (1955); Opinion of the Justices, 106 N.H. 180, 207 A.2d 574 (1965); New Jersey: Roe v. Kervick, 42 N.J. 191, 199 A.2d 834 (1964); New Mexico: Village of Deming v. Hosbreg Co., 62 N.M. 18, 303 P.2d 920 (1956) (two Justices dissenting); North Dakota: Gripentrog v. City of Wahpeton, 126 N.W.2d 230 (N.D.1964); Oklahoma: Harrison v. Claybrook, 372 P.2d 602 (Okl.1962). (Constitution permits the State to engage in any occupation or business for public purposes, except agriculture; see also, Application of Oklahoma Industrial Finance Authority, 360 P.2d 720 (Okl.1961) for constitutional provision authorizing limited pledge of State's credit for industrial development; South Carolina: Elliott v. McNair, S.C., 156 S.E.2d 421 (1967); Tennessee: McConnell v. City of Lebanon, 203 Tenn. 498, 314 S.W.2d 12 (1958) (two Justices dissenting; proposition required to be affirmed by the voters); Holly v. City of Elizabethton, 193 Tenn. 46, 241 S.W.2d 1001 (1951); Virginia: Fairfax County Industrial Develop. Auth. v. Coyner, 207 Va. 351, 150 S.E.2d 87 (1966); West Virginia: State ex rel. County Court of Mineral County v. Bane, 148 W.Va. 392, 135 S.E.2d 349 (1964); State ex rel. County Court of Marion County v. Demus, 148 W.Va. 398, 135 S.E.2d 352 (1964); Wisconsin: State ex rel. Bowman v. Barczak, 34 Wis.2d 57, 148 N.W.2d 683 (1967) (Act held prima facie for a public purpose; court did not pass on actual operation of authority); Wyoming: Uhls v. State, 429 P.2d 74 (Wyo.1967).
The following eleven states have passed acts authorizing industrial revenue bonds under express constitutional authority:
Arkansas: In 1957, Arkansas amended its constitution to permit counties and cities of the first or second class, with the consent of a majority of the qualified voters of the unit, to issue bonds in the approved amount for the purpose of securing and developing industry. Amendment Number 49. An act of the legislature also permits the state to purchase the bonds issued by private, nonprofit development finance corporations chartered by the State Bank Commission. The Arkansas Supreme Court, in Andres v. First Arkansas Development Finance Corp., 230 Ark. 594, 324 S.W.2d 97 (1959), held that the State's purchase of these bonds was not a loan of the State's credit.
Georgia: The General Assembly may amend the constitution to establish County Development Authority. Bonds approved in Smith v. State, 217 Ga. 94, 121 S.E.2d 113 (1961); bonds disapproved in Smith v. State, 222 Ga. 552, 150 S.E.2d 868 (1966).
*754 Louisiana: Art. 14, § 14 of the constitution authorizes municipalities to issue industrial revenue bonds. Miller v. Police Jury of Washington Parish, 226 La. 8, 74 So.2d 394 (1954); Hebert v. Police Jury of West Baton Rouge Parish, La.App., 200 So.2d 877 (1967).
Maine: Constitution art. IX, § 8, as amended in 1962, permits a municipality, when authorized by a majority of the registered voters, to issue bonds in order to construct facilities for lease or sale to industries, firms, or corporations. See Opinion of the Justices, 161 Me. 182, 210 A.2d 683 (1965). In addition, art. IX, § 14-A permits the legislature to insure payment of mortgage loans on industrial real estate within the state. See Martin v. Maine Savings Bank, 154 Me. 259, 147 A.2d 131 (1958); Opinion of the Justices, 153 Me. 202, 136 A.2d 528 (1957).
Missouri: Art. VI, § 23(a) allows cities to issue general obligation bonds for industrial financing by 2/3 vote; art. VI, § 27 allows city to issue revenue bonds for industrial financing by 4/7 vote.
Nebraska: Constitution art. XV, § 16 authorizes local units to acquire and develop property for lease to industry and to issue revenue bonds for the same purposes. (See further discussion of this amendment post.) See State ex rel. Meyer v. County of Lancaster, 173 Neb. 195, 113 N.W.2d 63 (1962).
New York: Effective January 1, 1967, an amendment to the constitution authorized the state to lend money "to a public corporation to be organized for the purpose of making loans to non-profit corporations to finance the construction" of new or expanding industrial or manufacturing plants. N.Y.Const. art. VII, § 8; art. XI, § 7.
Ohio: Constitution art. VIII, § 13, as amended in 1965, declares industrial development financing to be a public purpose and allows the issuance of bonds for financing industrial development. See State ex rel. Burton v. Greater Portsmouth Growth Corp., 7 Ohio St.2d 34, 218 N.E.2d 446 (1966).
Rhode Island: Constitution art. IV, §§ 10, 14, permits the appropriation of public funds for private purposes with the assent of two-thirds of the members of the General Assembly. Opinion to the Governor, 79 R.I. 305, 88 A.2d 167 (1952); Opinion to the Governor, 88 R.I. 202, 145 A.2d 87 (1958).
Texas: The 1967 Legislature enacted the Texas Industrial Development Act, which would authorize municipalities and Navigation districts to issue limited obligation bonds in aid of industry provided a proposed constitutional amendment is adopted by the electorate at the 1968 general election. The proposed amendment would add section 52a to Article III of the constitution and would grant the legislature the power to authorize local units to issue revenue bonds for industrial development. 1967 Acts of Texas, 60th Leg.S.J.R.No. 14.
Washington: In 1966, Washington amended art. VIII, § 8 of its constitution so that it now allows the use of public funds by port districts for industrial development in such manner as may be prescribed by the legislature.
Five states, Arizona, California, Massachusetts, Oregon, and South Dakota, apparently have not authorized industrial revenue bonds. Our research has disclosed no cases which have passed upon the validity of the acts of the following states: Colorado, Hawaii, Indiana, Minnesota, Montana, Nevada, New York, Pennsylvania, Utah and Vermont. (See Port Authority of City of Saint Paul v. Fisher, 275 Minn. 157, 145 N.W.2d 560 (1966) for decision upholding act authorizing use of industrial revenue bonds by St. Paul's Port Authority.) The present status of the Illinois Industrial Development Authority Act is unclear. See Bowes v. Howlett, 24 Ill.2d 545, 182 N.E.2d 191 (1962), in which the Supreme Court of Illinois held unconstitutional a continuing appropriation of $500,000.00 to *755 the Authority from the general revenue fund.
The Supreme Courts of at least six statesFlorida, Idaho, Maine, Nebraska, Ohio, and Washingtonhave held acts such as the one we now consider not to be for a public purpose and therefore unconstitutional. After these decisions, Maine, Nebraska, Ohio, and Washington amended their constitutions to permit legislation authorizing industrial revenue bonds.
In 1952, the Town of North Miami, Florida, proposed to issue revenue bonds to purchase lands upon which to erect an aluminum plant for lease to a private industry for twenty years. The bonds were to be paid from the net rental derived from the property and were not an obligation of the town. In State v. Town of North Miami, 59 So.2d 779 (1952), the Supreme Court of Florida held the proposed issue unconstitutional. The court said that it had long been the policy of the State to advertise the advantages of Florida to induce new people and new capital to come there because such programs inured to the benefit of all the citizens of the governmental units affected and not a particular private entity. However, in none of the cases decided under Florida's present constitution, the court continued, had it "approved any special legislative acts which authorized any of the political subdivisions or governmental units of the State to acquire property and erect buildings thereon for the exclusive use of a private corporation for private gain and profit." Id. at 784.
"Every new business, manufacturing plant, or industrial plant which may be established in a municipality will be of some benefit to the municipality. A new super market, a new department store, a new meat market, a steel mill, a crate manufacturing plant, a pulp mill, or other establishments which could be named without end, may be of material benefit to the growth, progress, development and prosperity of a municipality. But these considerations do not make the acquisition of land and the erection of buildings, for such purposes, a municipal purpose.
"Our government was founded upon the firm foundation that private property cannot be taken except when it will serve a public purpose. * * * If private property may be purchased by the municipality for the use and benefit of a private corporation, then it may be acquired by the great power of eminent domain for such a purpose. * * *
"Our organic law prohibits the expenditure of public money for a private purpose. It does not matter whether the money is derived by ad valorem taxes, by gift, or otherwise. It is public money and under our organic law public money cannot be appropriated for a private purpose or used for the purpose of aquiring property for the benefit of a private concern. It does not matter what such undertakings may be called or how worthwhile they may appear to be at the passing moment. The financing of private enterprises by means of public funds is entirely foreign to a proper concept of our constitutional system. Experience has shown that such encroachments will lead inevitably to the ultimate destruction of the private enterprise system." Id. at 784-785.
The Town of North Miami's proposed bond issue was without legislative authority, but the court made it quite clear that the basis of decision was not the absence of statutory authority because, it said, the legislature "cannot authorize a municipality to spend public money or lend or donate, directly or indirectly, public property for a purpose which is not public." Id. at 785. In State v. Clay County Development Authority, 140 So.2d 576 (Fla.1962), the court reaffirmed the ruling in State v. Town of Miami by invalidating a proposed issue of revenue bonds under legislative authority. See Note, 15 U.Fla.L.Rev. 262 (1962); see also, Tew, Industrial Bond Financing and the Florida Public Purpose Doctrine, 21 U.Miami L.Rev. 171 (1966).
*756 The Supreme Court of Nebraska, saying that State v. Town of North Miami pointed the way to the correct conclusion, invalidated that state's industrial bond act in State ex rel. Beck v. City of York, 164 Neb. 223, 82 N.W.2d 269 (1957). The City of York had proposed to issue revenue bonds and, with the proceeds thereof, to purchase a cold storage and packing plant and to lease it back to the vendor as a packing plant for slaughtering hogs. The court, after considering the opinions in other states which had held that such bonds were issued for a public purpose, concluded that these decisions were based on "fundamental fallacies of reasoning."
Although conceding that the location of a packing company in the city might give employment to its citizens and tend to balance a restricted economy, the court said: "But general benefit to the economy of a community does not justify the use of public funds of the city unless it be for a public as distinguished from a private purpose. This is simply a case where the city is attempting to use the powers, credits, and public moneys of the city to purchase land and erect industrial buildings thereon for the use of a private corporation for private profit and private gain. It serves no public or municipal purpose. The Act purports to grant powers to cities which are beyond the authority of the Legislature to confer." Id. at 230, 82 N.W.2d at 274.
As a result of the decision in State ex rel. Beck v. City of York, supra, in 1960, Nebraska amended its constitution to authorize municipalities to aid industrial enterprises by means of revenue bonds, which shall not become obligations of the governmental subdivision issuing them. Inter alia, the amendment also provided: (1) All real or personal property so acquired by a government unit "shall be subject to taxation to the same extent as private property during the time it is leased to or held by private interests"; (2) "The acquiring, owning, developing, and leasing of such property shall be deemed for a public purpose, but the governmental subdivision shall not have the right to acquire such property by condemnation (Italics ours); (3) No such governmental subdivision shall have the power to operate any such property as a business or in any manner except as the lessor thereof." Art. XV, § 16.
In Village of Moyie Springs, Idaho v. Aurora Mfg. Co., 82 Idaho 337, 353 P.2d 767 (1960), the Supreme Court of Idaho, following the reasoning of the courts of Florida and Nebraska, held unconstitutional an industrial revenue bond act similar to Nebraska's. In commenting upon the decisions which had held such acts constitutional, the court said: "Such decisions read like apologies to constitutional limitations, dictated by expediency." Id. at 345, 353 P.2d at 772. In denying the public purpose of such acts and the power of the legislature to exempt industrial revenue bonds and their income from taxation, the Idaho court said:
"* * * An exemption which arbitrarily prefers one private enterprise operating by means of facilities provided by a municipality, over another engaged, or desiring to engage, in the same business in the same locality, is neither necessary nor just. * * * It is obvious that private enterprise, not so favored, could not compete with industries operating thereunder. If the state-favored industries were successfully managed, private enterprise would of necessity be forced out, and the state, through its municipalities, would increasingly become involved in promoting, sponsoring, regulating and controlling private business, and our free private enterprise economy would be replaced by socialism. The constitutions of both state and nation were founded upon a capitalistic private enterprise economy and were designed to protect and foster private property and private initiative. * * *
"Moreover, the tax exemption granted to industries under the act, would result in casting an additional tax burden upon the other citizens and industries, not only of the municipalities directly participating, but of *757 the entire state." Id. at 349-350, 353 P.2d at 775.
In 1959, the Supreme Court of Washington held that an act of the legislature which, inter alia, authorized the Port of Seattle to condemn private lands for the development and sale to private entities as industrial sites was unconstitutional as authorizing the condemnation of private property for the private use of others. Hogue v. Port of Seattle, 54 Wash.2d 799, 341 P.2d 171 (1959). A constitutional amendment followed in 1966.
The exposition in the preceding Florida, Nebraska, Idaho, and Washington cases paralleled the dissent of Anderson, J., in the case of Albritton v. City of Winona, 181 Miss. 75, 178 So. 799, 115 A.L.R. 1436 (1938). In that case, the Supreme Court of Mississippi upheld the constitutionality of that state's "Balance Agriculture with Industry Plan." This the first of the municipal-industrial financing acts, was enacted "during, and presumably in response to, the depression." Notes, 70 Yale L.J. 789 (1961) and 20 Vand.L.Rev. 685 (1967); see Elliott v. McNair, S.C., 156 S.E.2d 421, 425 (1967). In his dissent, Anderson, J., said:
"The logic of the majority opinion leads to this: The Legislature, if it found necessary to relieve the unemployment, could authorize a municipality to take over, under the power of eminent domain, all property and all business of every kind within its corporate limits, and to manage and operate it as a public utility. And, of course, what the state could authorize municipalities to do, it could do itself." Id., 181 Miss. at 118, 178 So. at 812, 115 A.L.R. at 1454-1455.
In 1957, the legislature of the State of Maine considered a bill which would have authorized the City of Bangor to acquire by purchase, lease, or the right of eminent domain sites for the use of industrial development. In response to its request for an advisory opinion, the Supreme Court of Maine informed the legislature that the act would not be constitutional. The Justices said:
"We are unable to escape the conclusion that action under the Act would be for the direct benefit of private industry. An existing shoe factory or paper mill, let us say, within the proposed industrial area or park could not, for reasons clear to all, be authorized under our Constitution to acquire additional facilities by eminent domain. That such a course could well be of great value to the particular enterprise and so to the city or community would not affect the application of the law.
"The test of public use is not the advantage or great benefit to the public. `A public use must be for the general public, or some portion of it, who may have occasion to use it, not a use by or for particular individuals. It is not necessary that all of the public shall have occasion to use. It is necessary that every one, if he has occasion, shall have the right to use.' Paine v. Savage, 126 Me. 121, 126, 136 A. 664, 51 A.L.R. 1194." Opinion of the Justices, 152 Me. 440, 446-447, 131 A.2d 904, 907 (1957).
In 1962, Maine amended its Constitution to permit a municipality when authorized by a majority of its registered voters, to issue bonds in order to construct facilities for lease or sale to industries. Maine Const. art. IX, § 8-A. Notwithstanding this constitutional provision, the Supreme Court of Maine has continued to hold that state financing of industrial facilities does not serve a public purpose. It advised its legislature that a statute which declared that industrial projects financed under its Municipal Industrial and Recreational Obligation Act "shall be deemed to be used for a public purpose and shall be exempt from taxation so long as title to the project shall remain in the name of the municipality" violated Article IX, § 8 of the Maine Constitution. This section provides that "all taxes upon real and personal estate, assessed by authority of this State shall be apportioned and assessed equally, according to the just value thereof." The court said:
"The industrial and recreational projects envisioned by the proposed legislation are *758 inescapably designed to serve private purposes in spite of legislative fiat to the contrary and a tax exemption obviously intended to be predicated upon the existence of a public purpose would, where no such purpose exists, violate constitutional prohibitions." Opinion of the Justices, 161 Me. 182, 207, 210 A.2d 683, 697-698 (1965).
Massachusetts is also generally grouped with those jurisdictions which hold industrial revenue bonds to be invalid. The case relied upon, however, did not involve an industrial revenue bond act. In response to its request for an advisory opinion, the Supreme Judicial Court of Massachusetts informed the senate that a proposed act authorizing the city of Boston "to acquire by eminent domain or otherwise" a 28-acre abandoned railway yard within the city and sell it to a corporation to develop for both public and private uses, was unconstitutional. It was expected that adjacent areas and the city as a whole would profit from the development of the yard. Notwithstanding, the Massachusetts court said: "[O]ne proposition is thoroughly established practically everywhere, and so far as we are aware without substantial dissent, and that is that public money cannot be used for the primary purpose of acquiring either by eminent domain or by purchase private lands to be turned over or sold to private persons for private use." In Re Opinion of the Justices, 332 Mass. 769, 781-782, 126 N.E.2d 795, 802 (1955).
In State ex rel. Saxbe v. Brand, 176 Ohio St. 44, 197 N.E.2d 328 (1964), the Supreme Court of Ohio invalidated that state's industrial bond act upon grounds other than the absence of public purpose. As a result of this case, the Constitution of Ohio was amended to authorize "the lending of aid and credit" by the state and governmental subdivisions to private industry to create new employment. State ex rel. Burton v. Greater Portsmouth Growth Corp., 7 Ohio St.2d 34, 218 N.E.2d 446 (1966).
The reasoning of the courts of Florida, Idaho, Maine, Massachusetts, Nebraska, and Washington has been that of this Courtand we still consider it sound. The financing of private enterprise with public funds contravenes the fundamental concept of North Carolina's Constitution.
Ours is still an expanding economy. According to the stipulations, in 1961, the Commissioner of Revenue collected 456.2 million dollars in taxes; in 1967, 801.3 million. In each of the intervening years there was an increase in collections. In 1963, new and expanded plant investments in North Carolina amounted to $386,929,000; in 1966, $613,581,000. For the first half of 1967, industrial investments amounted to $313,850,000. There is no suggestion in the record, and the Court judicially notices, that our social order is not threatened by widespread unemployment such as confronted the entire nation during the depression years, which began in 1929. No drastic "pump-priming" legislation is presently required to save the economy. The State is not losing population because of the lack of job opportunities. (See McConnell v. City of Lebanon, supra, where such critical conditions were used to justify municipal aid to industry.)
The rule in North Carolina is that it is not the function of government to engage in private business. Nash v. Town of Tarboro, 227 N.C. 283, 42 S.E.2d 209 (1947), was an action to enjoin the Town of Tarboro from issuing bonds (which the legislature had authorized and the electorate had approved) for the construction of a hotel. The Town had no adequate hotel facilities. Notwithstanding, this Court held that the cost of constructing and maintaining a hotel was not a public purpose within the meaning of N.C.Const. art. V, § 3 and that the act of the legislature authorizing the expenditure was unconstitutional. In writing the opinion, Denny, J. (later C.J.), said:
"It may be desirable for the Town of Tarboro to have additional hotel accommodations. Such facilities would, no doubt, serve a useful purpose and tend to enhance *759 the value of property generally, as well as to promote the commercial life of the community, but ordinarily such benefits will be considered too incidental to justify the expenditure of public funds. * * * Every legitimate business in a community promotes the public good. * * * But `It may be safely stated that no decision can be found sustaining taxation by a municipality, where its principal object is to promote the trade and business interests of the municipality, and the benefit to the inhabitants is merely indirect and incidental.' * * * `Many objects may be public in the general sense that their attainment will confer a public benefit or promote the public convenience, but not be public in the sense that the taxing power of the State may be used to accomplish them.' * * *" Id. at 289-290, 42 S.E.2d at 214.
The opinion quoted with approval the following statement from Citizens' Savings & Loan Ass'n v. City of Topeka, 20 Wall. 655, 87 U.S. 655, 22 L.Ed. 455:
"`* * * If it be said that a benefit results to the local public of a town by establishing manufacturers, the same may be said of any other business or pursuit which employs capital or labor. The merchant, the mechanic, the innkeeper, the banker, the builder, the steamboat owner are equally promoters of the public good, and equally deserving the aid of the citizens by forced contributions. No line can be drawn in favor of the manufacturer which would not open the coffers of the public treasury to the importunities of two thirds of the business men of the city or town.'" Id. at 286, 42 S.E.2d at 211.
The Michigan court in City of Gaylord v. Beckett, 378 Mich. 273, 144 N.W.2d 460 (1966), cited Nash v. Town of Tarboro as putting North Carolina among the jurisdictions representing "the minority view" that municipal industrial aid financing cannot be upheld.
The cases upon which appellees rely are not inconsistent with Nash v. Town of Tarboro. In North Carolina State Ports Authority v. First-Citizens Bank & Trust Co., 242 N.C. 416, 88 S.E.2d 109 (1955), this Court approved the issuance of revenue bonds by the North Carolina State Ports Authority to construct a grain-handling facility upon the Authority's premises at its Morehead City Port. It also approved a 5-year lease of this property to a private corporation, which had successfully operated other such facilities. The rental would retire the bonds. These bonds were clearly for a public purpose. The lease, made for an adequate consideration, was a method of securing experienced and expert operators of an essential port facility. Hudson v. City of Greensboro, 185 N.C. 502, 117 S.E. 629 (1923), involved a municipal loan (authorized by legislation and approved by a vote of the people) to the Southern Railway Company, a public utility, to enable it to construct terminal facilities which were then urgently needed.
The State does not engage in a private enterprise when it undertakes a project of slum clearance. Wells v. Housing Authority, 213 N.C. 744, 197 S.E. 693 (1938). Slums are a serious menace to society; they breed both disease and crime. As Seawell, J., pointed out in Wells v. Housing Authority, supra, the State can combat these two evils in overcrowded areas only by "the removal of physical surroundings conducive to these conditions." Id. at 748, 197 S.E. at 696. The existence of a slum area proves the impotency or unwillingness of private enterprise to cope with the problem, and "where community initiative has failed and authority alone can prevail," government must deal with the emergency created. Id. at 748, 197 S.E. at 696. If slums are to be cleared, an Authority with the power of eminent domain is necessary to eliminate them. That power is greater than the power "which might be given by the Legislature in aid of any private enterprise." Id. at 750, 197 S.E. at 697.
In Dennis v. City of Raleigh, 253 N.C. 400, 116 S.E.2d 923 (1960), it was held that an appropriation of $2,500 by the City (made under statutory authority) to advertise *760 the advantages of Raleigh was for a public purpose albeit not a necessary expense. As the opinion pointed out, the purpose of the contemplated advertising was to promote the public interest and general welfare of the City, not a private business or property interest. Appropriations for such advertising, therefore, could be made from any surplus funds not derived from taxation.
It is the public policy of this State (as it is in Florida) to advertise the advantages of North Carolina in an effort to attract tourists and to induce industry to locate here. "If there is a benefit it is one that, unlike direct financial supports to an industry, does not aid primarily one private organization but rather inures to the entire community." Note, 40 Minn.L.Rev. 681, 682 (1956). According to the stipulations, the North Carolina Department of Conservation and Development annually expends approximately $750,000 in advertising and industry hunting. However, such efforts by the State and its subdivision are to induce industries to locate here "on their own"a far cry from providing a site and plant, built to specifications, to induce a particular industry to locate here.
In passing upon the validity of an act, this Court must consider the consequences of its decision. Were we to hold that Authority serves a public purpose when it acquires a site, constructs a manufacturing plant, and leases it to a private enterprise, we would thereby authorize the legislature to give Authority the power to condemn private property as a site for any project which it undertook. "For the most part the term `public purposes' is employed in the same sense in the law of taxation and in the law of eminent domain." 1 Cooley, Taxation § 176 (4th Ed. 1924).
That the legislature may grant the power of eminent domain to any state agency which needs to acquire property for a public purpose or use was clearly enunciated by Parker, J. (now C.J.), in Redevelopment Commission of Greensboro v. Security National Bank, 252 N.C. 595, 603, 114 S.E.2d 688, 694 (1960): "In the exercise of the power of eminent domain, private property can be taken only for a public purpose, or more properly speaking a public use, and upon the payment of just compensation." If, however, a project is for a public use, the grant of the power of eminent domain "is a clear and valid exercise of legislative power, for the power of eminent domain is merely the means to the end." Id. at 603, 114 S.E.2d at 694.
Prescott, Judge, dissenting in City of Frostburg v. Jenkins, 215 Md. 9, 136 A.2d 852, pointed out the possibilities inherent in holding an act such as the one we consider here to be for a public purpose:
"* * * Suppose A owns a parcel of land in Frostburg and desires to erect thereon a manufactory to make shoes. B is interested in conducting a shirt manufactory and the desirable location therefor is A's parcel of ground. Are there many persons who would consider that B's undertaking is such a `public purpose' as would entitle the City of Frostburg to condemn A's property in order to erect an establishment for B, paying both for the property and the erection of the building from the proceeds of the bonds issued in pursuance of the act being considered? I think not; yet the majority opinion holds that the bonds to be issued are for a `public purpose'." Id. at 27, 136 A.2d at 861.
That the power of eminent domain should or could ever be used in behalf of a private interest is a concept foreign to North Carolina, and it transcends our Constitution. If public purpose is now to include State or municipal ownership and operation of the means of productioneven on an interim basis; if we are to bait corporations which refuse to become industrial citizens of North Carolina unless the State gives them a subsidy, the people themselves must so declare. Such fundamental departures from well established constitutional principles can be accomplished in this State only by a constitutional amendment.
*761 We hold that Authority's primary function, to acquire sites and to construct and equip facilities for private industry, is not for a public use or purpose; that it may not expend the challenged appropriation of tax funds for its organization; and that the Act which purports to authorize the expenditure violates Article V, § 3 of the Constitution. This ruling makes it unnecessary for us to consider the other questions debated in the briefs.
The judgment of the court below is reversed and the case remanded to the Superior Court for the entry of judgment in accordance with plaintiff's prayer for relief.
Reversed and remanded.
HUSKINS, J., took no part in the consideration or decision of this case.
PARKER, Chief Justice (dissenting).
Article V, section 3, of the North Carolina Constitution provides: "The power of taxation shall be exercised in a just and equitable manner, for public purposes only, and shall never be surrendered, suspended, or contracted away."
This is said in Purser v. Ledbetter, 227 N.C. 1, 40 S.E.2d 702:
"Concededly, from its nature and purpose, a constitution is intended to be a forward-looking document, expressing the basic principles on which government is founded; and where its terms will permit, is to be credited with a certain flexibility which will adapt it to the continuous growth and progress of the State."
In Helvering v. Davis, 301 U.S. 619, 57 S.Ct. 904, 81 L.Ed. 1307, 109 A.L.R. 1319, Mr. Justice Cardozo said for the Court:
"Needs that were narrow or parochial a century ago may be interwoven in our day with the well-being of the nation. What is critical or urgent changes with the times."
In Mayo v. Board of Commissioners, 122 N.C. 5, 29 S.E. 343, 40 L.R.A. 163, this Court held in a divided opinion that "the erection and operation of an electric light plant for lighting the streets of a town is not a `necessary expense' within the meaning of Section 7, Art. VII of the State Constitution." Clark, J., vigorously dissented. This Court five years later in Fawcett v. Mt. Airy, 134 N.C. 125, 45 S.E. 1029, 63 L.R.A. 870, overruled the decision in the Mayo case and held "an expense incurred by a city or town for the purpose of building and operating plants to furnish water and lights is a necessary expense * * *." The Fawcett case overruled the Mayo case because the Court realized the expanding need of all the people for such a holding.
The legislative findings and purposes which preface the enactment of the Act challenged here (Ch. 535, Session Laws of North Carolina 1967) are as follows:
"Legislative Findings and Purposes. The General Assembly finds and determines that in order to meet the challenge of attracting new industry posed by the inducements to industry offered through legislative enactments in other jurisdictions and to continue the State's progress in industrial development, it is necessary to establish a public agency and an instrumentality of the State to facilitate the provision of facilities promoting industrial development in the State and otherwise effectuating the purposes of this Act, without the levy of any additional taxes therefor. The purposes of this Act are to promote the industry and natural resources of the State, increase opportunities for gainful employment, increase purchasing power, improve living conditions, advance the general economy, expand facilities for research and development, increase vocational training opportunities and otherwise contribute to the prosperity and welfare of the State and its inhabitants by providing facilities for operation by private operators useful for industrial and research pursuits, such *762 purposes being, and are hereby declared to be, public purposes." (Emphasis mine.)
Although the legislative findings and policy purposes have no magical quality to make valid that which is invalid, and are subject to judicial review, they are entitled to weight in construing the statute and in determining whether the statute promotes a public purpose or use under the North Carolina Constitution. Redevelopment Commission of Greensboro v. Security National Bank, 252 N.C. 595, 114 S.E.2d 688.
This is said in the majority opinion:
"The lessee of any project is required to list it for taxation in the manner of an owner and to pay `an amount equal to the total amount of ad valorem taxes that would * * * be levied' upon the leased property if it were owned by a private citizen. G.S. 123A-9."
This is a stipulation of facts agreed to by the parties:
"26. Statistical data from the Chamber of Commerce of the United States indicates that every 100 new factory workers bring to an area the following:
 "359 more people
 91 more school children
 $710,000 more personal income per
 year
 100 more households
 $229,000 more bank deposits
 3 more retail establishments
 97 more passenger cars registered
 65 more employed in non-manufacturing
 $331,000 more retail sales per year."
In Briggs v. City of Raleigh, 195 N.C. 223, 141 S.E. 597, the Court, speaking by Stacy, C.J., said:
"* * * However, the term `public purpose' is not to be construed too narrowly. [Citing authority.] It is not necessary, in order that a use may be regarded as public, that it should be for the use and benefit of every citizen in the community. It may be for the inhabitants of a restricted locality, but the use and benefit must be in common, and not for particular persons, interests, or estates.
* * * * * *
"* * * It is only when the unconstitutionality of an act of the Legislature is clear that the courts, in the exercise of their judicial powers, are required to hold it for naught. Hence, every presumption is indulged in favor of the validity of the legislation called in question. State v. Yarboro, 194 N.C. 498, 140 S.E. 216; State v. Revis, 193 N.C. 192, 136 S.E. 346, 50 A.L.R. 98; State v. Manuel, 20 N.C. 154.
"`To justify a court in declaring a tax invalid on the ground that it was not imposed for the benefit of the public, the absence of a public interest in the purpose for which the money is raised by taxation must be so clear and palpable as to be immediately perceptible to every mind.' Norval, J., in State ex rel. Douglas County v. Cornell, 53 Neb. 556, 74 N.W. 59, 39 L.R.A. 513, 68 Am.St.Rep. 629. Or as said in substance by the Supreme Court of Illinois: `The inquiry into the validity of an act of the Legislature is an inquiry whether the will of the people as expressed in the law, is or is not in conflict with the will of the people, as expressed in the Constitution; and unless it be clear that the Legislature has transcended its authority, the courts will not interfere.' Lane v. Doe ex dem. Dorman, 4 Ill. 238."
In Yarborough v. North Carolina Park Commission, 196 N.C. 284, 145 S.E. 563, Justice Adams, one of the most scholarly judges who has served upon this Bench, said for the Court:
"It is not easy to frame a definition of the term `public use' which would be of universal application, but it is settled by our decisions that whether a use is public is for the ultimate decision of *763 the courts and that if a particular use is public the expediency or necessity for establishing it is exclusively for the Legislature."
In Shoemaker v. United States, 147 U.S. 282, 297, 13 S.Ct. 361, 389, 37 L.Ed. 170, 184, the Court said:
"In the memory of men now living, a proposition to take private property, without the consent of its owner, for a public park, and to assess a proportionate part of the cost upon real estate benefited thereby, would have been regarded as a novel exercise of legislative power.
* * * * * *
"* * * However that may be, there is now scarcely a city of any considerable size in the entire country that does not have, or has not projected, such parks.
"The validity of the legislative acts erecting such parks, and providing for their cost, has been uniformly upheld."
In State Highway Commission v. Thornton, 271 N.C. 227, 156 S.E.2d 248, this Court in a divided opinion held as correctly summarized in the nineteenth headnote in our Reports:
"The road in question was constructed for a distance of some 700 feet over the land of respondents, and ended in a cul de sac at the freight terminal of a truck carrier. Held: While a finding, supported by evidence, that the road was used by the truck carrier 24 hours a day in going to and from the public highway would not alone support the conclusion that the condemnation of the land for the road was for a public purpose, such finding with additional findings that some 700 employees of the carrier use the road for their own benefit in going to and from work, and that other members of the public used the road to transact business with the carrier, are together sufficient to support the conclusion that the road was for a public purpose."
The facts in the Thornton opinion written by Justice Lake showing a public purpose or use for the expenditure of tax funds in that case are far weaker than the facts showing a public purpose or use for the expenditure of public funds in this case, and the opinion in the Thornton case cannot be supported by opinions from twenty-one states showing the expenditure of public funds was for a public purpose or use as in this case. These supporting cases are cited further in this dissenting opinion. In my opinion the majority opinion in this case gravely impairs the authority of the decision in the Thornton case, if it does not in effect overrule it. The author of the majority opinion in the present case dissented in the Thornton case on the ground that "this decision, however, establishes the power of the State Highway Commission to condemn a right-of-way for a road to the plant of any private industry with a payroll which the Chamber of Commerce, or some other group able to influence the Highway Commission, decides is large enough to benefit the economy of the community."
This is said in the majority opinion:
"Whatever may be the ultimate fate of governmental industrial revenue bonds, our research indicates that at least forty-two states (not counting North Carolina) have held that governmental financing for industrial development serves a public purpose. The courts of the twenty-one jurisdictions listed below have, without constitutional amendments, upheld the validity of legislation authorizing governmental industrial aid bonds or other types of financial assistance. They have either assumed the public purpose of such acts or reasoned as follows: An inadequate number of jobs means an oversupply of labor, which results in low wages. Unemployment and low wages lead to hunger, ill health, and crime. The continued existence of an established industry and the establishment of new industry provide jobs, measurably increase the resources of the *764 community, promote the economy of the state, and thereby contribute to the welfare of its people. The stimulation of the economy is, therefore, an essential public and governmental purpose. The fact that a private interest incidentally benefits from such governmental aid is not fatal if substantial public benefits also result. See generally, Note, The `Public Purpose' of Municipal Financing for Industrial Development, 70 Yale L.J. 789 (1961); Note, 20 Vand.L.Rev. 685 (1967)."
North Carolina is no longer a predominantly agricultural community. We are developing from an agrarian economy to an agrarian and industrial economy. North Carolina is having to compete with the complex industrial, technical, and scientific communities that are more and more representative of a nation-wide trend. All men know that in our efforts to attract new industry we are competing with inducements to industry offered through legislative enactments in other jurisdictions as stated in the legislative findings and purposes of this challenged Act. It is manifest that the establishment of new industry in North Carolina will enrich a whole class of citizens who work for it, will increase the per capita income of our citizens, will mean more money for the public treasury, more money for our schools and for payment of our school teachers, more money for the operation of our hospitals like the John Umstead Hospital at Butner, and for other necessary expenses of government. This to my mind is clearly the business of government in the jet age in which we are living. Among factors to be considered in determining the effect of the challenged legislation here are the aggregate income it will make available for community distribution, the resulting security of their income, and the opportunities for more lucrative employment for those who desire to work for it. We read daily in the press and hear over radio and television and from public speakers that North Carolina is near the bottom of the states in per capita income and in furnishing public funds for public education. I am strongly of the opinion that public education and the establishment of public hospitals like the John Umstead Hospital at Butner by the State are a public necessity. Mr. Justice Oliver Wendell Holmes, a distinguished lawyer and scholar and a Justice of the Supreme Court of the United States, paid this eloquent tribute to the advantages of University training:
"The University is a place from which men start for the Eternal City. In the University are pictured the ideals which abide in the City of God. Many roads lead to that haven, and those who are here have traveled by different paths toward the goal * * *. My way has been by the ocean of the law. On that I have learned a part of the great lesson, the lesson not of law, but of life."
This is stated in the majority opinion:
"Ours is still an expanding economy. According to the stipulations, in 1961, the Commissioner of Revenue collected 456.2 million dollars in taxes; in 1967, 801.3 million. In each of the intervening years there was an increase in collections. In 1963, new and expanded plant investments in North Carolina amounted to $386,929,000; in 1966, $613,581,000. For the first half of 1967, industrial investments amounted to $313,850,000. There is no suggestion in the record, and the Court judicially notices, that our social order is not threatened by widespread unemployment such as confronted the entire nation during the depression years, which began in 1929. No drastic `pump-priming' legislation is presently required to save the economy. The State is not losing population because of the lack of job opportunities."
When the majority opinion in this case strikes down the challenged Act, will these conditions continue when forty-two states of the Union, including six in close proximity to us, are inducing industry by legislative enactments similar to our Act to settle within *765 their borders? It seems not, because the parties when this case was tried entered into the following stipulations:
"27. There is a trend for States that lack a well balanced industrial economy to lose population to other areas of the country.
"28. Records of the Department of Conservation and Development of the State of North Carolina disclose that:
"(a) Several large industrial firms with options to purchase industrial sites in North Carolina have permitted their options to expire, and said industries have ultimately located outside of North Carolina in states that afford financing of industrial sites through tax exempt industrial revenue bonds; and
"(b) Several other large industries have made plans to locate plants within the State of North Carolina in reliance upon financing being available through tax exempt industrial revenue bonds, as authorized by Chapter 535, Session Laws of 1967."
The General Assembly did not think so because of the enactment of this Act and their legislative findings and purposes stated in the preamble. The Legislature was motivated to do all that they thought in their discretion was proper to raise North Carolina from its low rank in the states in per capita income and in appropriations for education, and to give it a means of competing with the other states and to take rank among the more prosperous states of the Union, as all of us wish it could do.
Three of the states adjoining our borders (Virginia, Tennessee, and South Carolina) and three states in close proximity to this State (Maryland, West Virginia, and Kentucky) have held that government financing for industrial development serves a public purpose: Fairfax County Industrial Develop. Auth. v. Coyner, 207 Va. 351, 150 S.E.2d 87; Elliott v. McNair, S.C., 156 S.E.2d 421; McConnell v. City of Lebanon, 203 Tenn. 498, 314 S.W.2d 12; City of Frostburg v. Jenkins, 215 Md. 9, 136 A.2d 852; State ex rel. County Court of Marion County v. Demus, 148 W.Va. 398, 135 S.E.2d 352; Industrial Development Authority v. Eastern Kentucky Regional Planning Commission (Ky.C.A.) 332 S.W.2d 274; Holly v. City of Elizabethton, 193 Tenn. 46, 241 S.W.2d 1001.
The Supreme Court of Appeals of Virginia said in the Fairfax case, a unanimous opinion:
"Even a casual reading of the provisions of Chapter 643 reveals that the primary and dominant purpose of the Act is to promote the economy of the State and to contribute to the welfare of its people within the areas designated.
* * * * * *
"The fact that the Authority proposes to issue revenue bonds for the financing and construction of an industrial facility to be leased to a private user does not make the Act unconstitutional. Even though some private individual or corporation incidentally benefits from the financing, construction and use of the proposed facility, its public purpose and character are not destroyed. Harrison v. Day, supra, 202 Va. 967, 972-973, 121 S.E.2d 615, 619; Button v. Day, 205 Va. 629, 638, 139 S.E.2d 91, 97. Nor does the granting of an option to Karloid to purchase the property at the termination of Hazleton's lease destroy the public character of the enterprise. See Darnell v. County of Montgomery, 202 Tenn. 560, 308 S.W.2d 373, 374, 375.
"Having held that authorities created for the purpose of acquisition and development and operation of produce markets, harbor and port facilities, and marinas for public use were for a public purpose and a proper governmental function, it would indeed be an anomaly for us to say that an authority created for the purpose of stimulating and promoting industrial development, which would contribute to the economy of the State and create jobs for its people, was not for a *766 public purpose and thus not a proper function of government."
In the Elliott case, a unanimous opinion, the Supreme Court of South Carolina said:
"The question as to whether the Act is violative of Article I, Section 5, of the Constitution, as constituting legislation for private rather than for public purpose, is a question which has given us much concern. All legislative action must serve a public rather than a private purpose. There is no doubt of the fact that the economy of South Carolina has undergone a startling change in the last few years. The inhabitants of this state were for many years dependent almost entirely upon agriculture and related industries for their livelihood. Agriculture no longer provides the livelihood of those who only a few years ago were almost entirely supported by it. The Act here under consideration recites that South Carolina has promoted industrial expansion and has actively supported the State Development Board, for which public moneys have been appropriated, and through it has endeavored to promote the industrial development of the state for the welfare of its inhabitants. This has been done as a matter of state policy. It is the purpose of the Act to empower the governing bodies of the several counties of the state, under the terms and conditions of this Act, to provide such assistance and to that end to acquire, own, lease, and dispose of properties, through which the industrial development of the state will be promoted, and trade developed by inducing manufacturing, and other commercial enterprises to locate in and remain in the state, and to utilize and employ the manpower, agricultural products and natural resources of the state.
"In the case of Duke Power Co. v. Bell, 156 S.C. 299, 152 S.E. 865, decided in 1930, this court observed that:
"`Ours is distinctively an industrial age, and the prosperity of counties and of states, as well as of cities and towns, is becoming increasingly dependent upon the opportunity afforded their people for employment in manufacturing industries.'
"The activities of the state in the development of its ports has reduced transportation costs and made new markets available in a manner which has been of significant benefit to the industries of the state, thus indirectly promoting the influx of additional industries and the expansion of existing industries. Waterworks and other utilities have been made available to industries located beyond the corporate limits of municipalities and have thus done much to promote expanded industrial activity.
* * * * * *
"The Legislature has found the Act here is for a public purpose and thus a proper function of government. The question of whether an act is for a public purpose is primarily one for the Legislature, and this court will not interfere unless the determination by that body is clearly wrong."
The Supreme Court of Tennessee said in the McConnell case (two justices dissented):
"It is a widely known fact that the North and East have been losing industry to the South and West in this country; that industry is being located in States where all things are most favorable; that population shift is controlled by the location of industry. The result is, as reflected by the record herein, the matter of inducing industry to locate in this State has become a matter of great public concern, as so made to appear in Section 3 of the questioned Act.
"The modern tendency is to meet that challenge by appropriate legislation. [Citing voluminous authority.]
"The alternative of the failure to do so is to make probable a gradual lowering of the standard of living of the mass of *767 citizens of this State. An inadequate number of jobs means an oversupply of labor, which usually results ultimately in a lowering of wages. Low wages and unemployment are twin evils that usually lead to a substandard diet, hunger, ill health and even crime.
"To provide against such evils is clearly a public or corporate purpose."
The Supreme Court of Tennessee said in the Holly case:
"The promotion of the industry authorized by the hereinbefore mentioned provisions of Chapter 137 is clearly of incidental public benefit to the municipality where such industry may be located at least, to the extent that it will furnish employment to a substantial number of its inhabitants. It is, then, at least incidentally for a public purpose, though it results in the promotion of and gain to a private corporation."
In the City of Frostburg case the Court of Appeals of Maryland said, with one judge dissenting:
"The only declaration of public policy in the enabling act before us is the statement that the power is granted `in order to encourage industrial development.' The legislative purpose, however, is somewhat amplified in the allegations of the answer, which are admitted for the purpose of this case, and we might, indeed, take judicial notice of the fact that the location of new industry in a municipality furnishes employment and measurably increases the resources of the community and its financial well-being. As the Supreme Court recognized in the Carmichael case [Carmichael v. Southern Coal & Coke Co.], supra [301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245], the relief of unemployment is a legitimate public purpose. The fact that incidental benefits are passed on to the locating corporation is not fatal, if there are substantial public benefits to support the action taken. * * *
"In the instant case there are obvious benefits passing to the private corporation, and enuring to the benefit of its stockholders. One benefit is the financing of its building program at a favorable interest rate. It is common knowledge that municipal bonds can usually be floated at a lower yield than industrial bonds, because of the tax immunities, and because they are supported by tax revenues instead of earnings. Although interest rates are not fixed in the Ordinance, we assume that the scheme contemplates that the saving be passed on to the corporation under its contract to purchase the land and building in installments in twenty-five years. Another benefit may arise from the fact that title will remain in the City during that period. We assume that the property so held would not be subject to property taxes. But whether these private benefits outweigh the public benefits accruing from the location of the plant within the municipality seems to us to be primarily a legislative rather than a judicial problem.
* * * * * *
"The Constitution does not guarantee a static condition of society, or write into our basic law the economic doctrine of laissez-faire. So long as the legislation has a substantial relation to the public welfare and can fairly be said to serve a public purpose, it is not the courts' function to strike it down, merely because we fear it may lead to unwise or unfortunate results. We think the legislation in the instant case is not beyond the bounds of legislative power."
The majority opinion in the instant case closes with a quotation from Judge Prescott, who dissented in the City of Frostburg case. That quotation is simply Judge Prescott's idea of the law, and his opinion was repudiated by the other six members of the Court who ruled differently.
In the Demus case, a unanimous opinion, the Supreme Court of Appeals of West Virginia held that the Industrial Development Bond Act was not in contravention *768 of Sections 1, 6 and 8 of Article X or Sections 9 and 10 of Article III of the West Virginia Constitution and not in violation of the Fourteenth Amendment to the Constitution of the United States.
In the Industrial Development Authority case the Court of Appeals of Kentucky, with two judges dissenting, said:
"In the present instance, KRS 154.005 clearly sets out the legislative determination that the purpose of the Act is to promote the health, safety, morals, right to gainful employment, business opportunities and general welfare of Kentuckians and recites that the Authority `shall exist and operate for the public purpose of alleviating unemployment and furthering the utilization of natural and man-made resources by the promotion and development of industrial and manufacturing enterprises in local communities of the Commonwealth.' The consummation of these objects shall be `public purposes for which public money may be spent.'
"As the central aim of the Act is to foster industrial development by attracting new industry to all parts of the state in order to reduce unemployment and in order to use the natural and man-made resources of the state as a whole, the inquiry is raised as to whether such an aim is a public purpose so as to warrant the expenditure of tax funds therefor. This Court in the fairly recent case of Dyche v. City of London, Ky., 288 S.W.2d 648, held that the relief of unemployment in the City of London and the surrounding area was a `public purpose' within the purview of the taxing power of that city, and that the City of London could lawfully incur a bonded indebtedness to construct an industrial building in an effort to attract new industry and thereby reduce unemployment. In Faulconer v. City of Danville, cited above, we held that the acquisition and ownership by the City of Danville of an industrial building was a `public project' within the application of KRS Chapter 58 which authorized the issuance of revenue bonds for such an object.
"From the foregoing authorities we conclude it is clearly established in this jurisdiction that the relief of unemployment is a public purpose that would justify the outlay of public funds."
In accord with the foregoing decisions from Virginia, Tennessee, South Carolina, Maryland, West Virginia, and Kentucky: See Newberry v. City of Andalusia, 257 Ala. 49, 57 So.2d 629; DeArmond v. Alaska State Development Corporation (Alaska), 376 P.2d 717; Roan v. Connecticut Industrial Building Commission, 150 Conn. 333, 189 A.2d 399; In re Opinion of the Justices, 4 Storey 366, 54 Del. 366, 177 A.2d 205; Green v. City of Mt. Pleasant, 256 Iowa 1184, 131 N.W.2d 5; State ex rel. Ferguson v. City of Pittsburg, 188 Kan. 612, 364 P.2d 71; Faulconer v. City of Danville, 313 Ky. 468, 232 S.W.2d 80; City of Gaylord v. Beckett, 378 Mich. 273, 144 N.W.2d 460; Albritton v. City of Winona, 181 Miss. 75, 178 So. 799, 115 A.L.R. 1436, appeal dismissed 303 U.S. 627, 58 S.Ct. 766, 82 L.Ed. 1088; Opinion of the Justices, 106 N.H. 237, 209 A.2d 474; Opinion of the Justices, 103 N.H. 258, 169 A.2d 634; Opinion of the Justices, 106 N.H. 180, 207 A.2d 574; Roe v. Kervick, 42 N.J. 191, 199 A.2d 834; Village of Deming v. Hosdreg Co., 62 N.M. 18, 303 P.2d 920; Gripentrog v. City of Wahpeton (N.D.), 126 N.W.2d 230; Harrison v. Claybrook (Okl.), 372 P.2d 602; State ex rel. County Court of Mineral County v. Bane, 148 W.Va. 392, 135 S.E.2d 349; State ex rel. Bowman v. Barczak, 34 Wis.2d 57, 148 N.W.2d 683; Uhls v. State (Wyo.), 429 P.2d 74.
The majority opinion has adopted a very minority view in this country. In my opinion the majority opinion construes what is for a public purpose or use too narrowly, influenced by the concept of the horse-and-buggy days, when, in Mr. Justice Cardozo's words, "needs were narrow or parochial." We have moved into a jet age, characterized by gigantic mergers of corporations and struggles between the states *769 of this Nation to get new industry; and, in the language of the legislative findings and purposes, this Act is necessary for the State's progress and growth in order "to meet the challenge of attracting new industry posed by the inducements to industry offered through legislative enactments in other jurisdictions and to continue the State's progress in industrial development." In this jet age conditions for industrial development are critical or urgent, and, in Mr. Justice Cardozo's words, "What is critical or urgent changes with the times." North Carolina's efforts to attract new industry will be hampered, according to stipulation of facts No. 28 between the parties which has been set forth heretofore, if the majority opinion becomes the law in this State.
Whether in my opinion the purposes of the challenged Act will be beneficial or not to the people of North Carolina cannot influence my vote as a judge. It is not the Court's function to strike the Act down merely because we fear it may lead to unwise or unfortunate results. This is said by Lake, J., for a unanimous Court in Hobbs v. Moore County, 267 N.C. 665, 149 S.E.2d 1: "It is also well established that this Court will not adjudge an act of the General Assembly unconstitutional unless it is clearly so. Kornegay v. City of Goldsboro, 180 N.C. 441, 105 S.E. 187. Where a statute is susceptible of two interpretations, one of which will render it constitutional and the other will render it unconstitutional, the former will be adopted." This is said by Moore, J., speaking for the Court, in State v. Warren, 252 N.C. 690, 114 S.E.2d 660: "The presumption is that an act passed by the Legislature is constitutional, and it must be so held by the courts unless it appears to be in conflict with some constitutional provision. Roller v. Allen, supra [245 N.C. 516, 518, 96 S.E.2d 851]; State v. Dixon, supra [215 N.C. 161, 1 S.E.2d 521]; State v. Hurlock (1932), 185 Ark. 807, 49 S.W.2d 611, 612. The legislative department is the judge, within reasonable limits, of what the public welfare requires, and the wisdom of its enactments is not the concern of the courts. As to whether an act is good or bad law, wise or unwise, is a question for the Legislature and not for the courtsit is a political question. The mere expediency of legislation is a matter for the Legislature, when it is acting entirely within constitutional limitations, but whether it is so acting is a matter for the courts."
I have restricted my dissent to the one question as to whether the expenditure is for a public purpose or use because that is the sole reason why the majority opinion strikes the Act down. This serious question arises upon the record: Does the money which will be received by the Authority become impressed with a trust restricting its use to the public purpose for which it was obtained, the construction of the project; and for that reason does the money not become public money whose expenditure would otherwise be confined to the general public good? However that may be, it is not necessary to decide that question here, because it has not been discussed or mentioned in the majority opinion, though it would seem that under the facts of this case the answer to the question posed would be "No," except for the allotment in the sum of $37,062 from the State's Contingency and Emergency Fund for the use of the Authority for the fiscal year 1967-68, and the expenditure of this fund is surely under the circumstances of the case for a public purpose or use. It is to be specially noted that the Authority in this case has not been empowered by the General Assembly to issue general obligation bonds of the State payable from the proceeds of ad valorem tax levies, but that power has been positively denied to it by the Act of the General Assembly as set forth above. See Elliott v. McNair, supra.
The General Assembly in the preamble to the challenged Act has interpreted the needs of the State and declared its policy. *770 If the result of today's action by this Court is to hamper the State in meeting the "challenge of attracting new industry posed by the inducements to industry offered through legislative enactments in other jurisdictions," and to curtail "the State's progress in industrial development," I want to go on record that no part of the responsibility or blame is mine. I believe the challenged Act, construed in the light of conditions existing today, clearly permits the expenditure of public funds for a public purpose or use; and my vote is to uphold the constitutionality of the Act, insofar as challenged here, because this enactment is not prohibited by any provision of the State or Federal Constitution so far as it is challenged on the present record. Consequently, my vote is to affirm the judgment of the court below.
BRANCH, J., joins in this dissent.